**In re ANC RENTAL CORPORATION, INC., et al., Debtors.**

**No. 01–11200(MFW).**

United States Bankruptcy Court, D. Delaware.

May 3, 2002.

Bonnie Glantz Fatell, Mark J. Packel, Blank Rome Comisky & McCauley LLP, Wilmington, DE, Matthew Gluck, Fried, Frank, Harris, Shriver & Jacobson, New York City, for debtors.

Brendan Linehan Shannon, Sean M. Beach, Young Conaway Stargatt & Taylor, LLP, Wilmington, DE, Duane D. Morse, Wilmer Cutler & Pickering, Tysons Corner, VA, for Official Committee of Unsecured Creditors.

Kevin Gross, Rosenthal, Monhait, Gross & Goddess, P.A., Wilmington, DE, Orla E. Collier, Benesch Friedlander Coplan & Aranoff, LLP, Columbus, OH, for Avis Rent-A-Car System, Inc.

Ian Connor Bifferato, Bifferato, Bifferato & Gentilotti, Wilmington, DE, for Hertz Corporation.

Frederick B. Rosner, Cozen and O'Connor, Wilmington, DE, Mark S. Gamell, Torre, Lentz, Gamell, Gary & Rittmaster, LLP, Jericho, NY, for Liberty Mutual Insurance Co.

Mark D. Collins, Paul N. Heath, Wilmington, DE, for Congress Financial Corp.

William P. Bowden, Ashby & Geddes, Wilmington, DE, for Lehman Brothers, Inc.

## *OPINION*[1]

MARY F. WALRATH, Bankruptcy Judge.

This matter is before the Court on the Motions of the Debtors for authority to assume and assign to ANC Rental Corporation, Inc. ("ANC") certain executory contracts and leases of National Car Rental System, Inc. ("National") and to reject certain executory contracts and leases of Alamo Rent–a–Car, L.L.C. ("Alamo") at four airports. The Motions are opposed by Avis Rent A Car System, Inc. ("Avis") and The Hertz Corporation ("Hertz").[2] For the reasons set forth below, we grant the Motions.

## I. *FACTUAL BACKGROUND*

On November 13, 2001, ANC and several of its subsidiaries, including National and Alamo, filed voluntary petitions under chapter 11 of the Bankruptcy Code. Prior to the filing, National was in the business of renting cars primarily to business travelers and Alamo was in the business of renting cars primarily to vacation travelers. Both National and Alamo operated concessions at more than 70 airports, pursuant to concession and related agreements (collectively "the Concession Agreement") with the various governmental entities responsible for concessions at those airports ("the Airport Authorities"). The Concession Agreement was usually granted after open bidding pursuant to applicable statutes and regulations. Concessionaires were typically required to provide financial and operating informa-

tion to the Airport Authorities with their bids, which included an agreement to pay percentage rent subject to a minimum annual guaranteed rent ("the MAG"). The Airport Authorities ·accepted bids and granted preference in location to bidders with the highest MAGs. Other than the MAGs, the Concession Agreements contained identical terms for all concessionaires at a specific airport.

Subsequent to the bankruptcy filing, the Debtors determined to consolidate the National and Alamo operations at the airports. To do so, they decided to reject one Concession Agreement at the airport and to assume the other Concession Agreement and assign it to ANC. ANC in turn would receive a license from both National and Alamo to operate under each of those brands at the consolidated location at the airports.

The Debtors filed their first Motion for approval of the rejection of the Alamo Concession Agreement and the assumption and assignment of the National Concession Agreement at the Cincinnati airport ("the Cincinnati Motion") on January 4, 2002. Both Avis and Hertz objected to that Motion and also filed Motions for Relief from the Stay to permit them to add the Debtors as defendants in an injunction action they had brought in state court against the Kenton County Airport Authority to enjoin it from agreeing to the consolidated arrangement.

A hearing was held on the Cincinnati Motion and on the Motions for relief from the stay on January 25, 2002. The Kenton County Airport Authority did not object to

**1.** This Opinion constitutes the findings of fact and conclusions of law of the Court pursuant to Federal Rule of Bankruptcy Procedure 7052, which is made applicable to contested matters by Federal Rule of Bankruptcy Procedure 9014.

**2.** Although Liberty Mutual Insurance Company ("Liberty") also filed a limited objection to the Motions, that objection is resolved if certain language is included in the proposed orders granting the relief requested by the Debtors, to protect Liberty's rights as surety under bonds posted at the airports in question.

the Motion, although Avis and Hertz did. At the conclusion of the hearing, we denied the Motions for relief from the stay and granted the Cincinnati Motion. We concluded that the Debtors could assume and assign the National Concession Agreement (as it was written) to ANC, even without the consent of the Kenton County Airport Authority, pursuant to section 365(f) of the Bankruptcy Code. We found that the Debtors' Motion sought only to change the name of the concessionaire from National to ANC and, therefore, it was not a modification of that Concession Agreement, in violation of section 365(f).[3] We further concluded that there was no applicable law that prohibited the assumption and assignment of the Concession Agreement without the consent of the Kenton County Airport Authority. Because the sole basis of the request for relief from the stay was to include the Debtors in the injunction action filed against the Kenton County Airport Authority in which Hertz and Avis were asserting that the Airport Authority could not consent to the assumption and assignment (which we had found was not necessary under section 365), we denied the request for relief from the stay. Hertz and Avis have appealed those decisions.

Since January, the Debtors have filed additional motions to reject certain Concession Agreements and to assume and assign others to ANC which would operate both the Alamo and the National brands at a single location. In every instance Hertz and Avis have objected. The Motions currently before the Court involve the following airports: Melbourne, Florida; Las Vegas, Nevada; Memphis, Tennessee; and Houston, Texas (the Hobby Airport). A hearing was held on those Motions on March 27, 2002.

Avis and Hertz raised many objections, notably that the Concession Agreements cannot be assumed and assigned without consent of the respective Airport Authorities as required by section 365(c) because applicable non-bankruptcy law prohibits it. The Debtors dispute this contention and also contest the standing of Avis and Hertz to be heard on the Motions. At the conclusion of the hearing, we directed the parties to submit briefs on these issues. Briefs were submitted on April 5 and April 10, 2002.

## II. JURISDICTION

This Court has jurisdiction over these Motions, which are core proceedings pursuant to 28 U.S.C. § 1334 and § 157(b)(1), (b)(2)(A), (G), (M), and (O).

## III. DISCUSSION

### A. Standing

■ The Debtors argue preliminarily that neither Hertz nor Avis have standing to be heard on the Motions. Neither is a creditor nor a shareholder in this case. Rather, both are direct competitors of National and/or Alamo at the airports in question (as well as at many if not all of the other 70 airports where National and/or Alamo operate rental car concessions). In addition, neither Hertz nor Avis

---

**3.** The Kenton County Airport Authority had originally agreed to that arrangement subject to a modification of the National Concession Agreement to increase the MAG. This was opposed by Hertz and Avis, asserting that it was a modification of the agreement making section 365(f) inapplicable. Consequently, at the hearing the Debtors asked that the National Concession Agreement be assumed and assigned without any modification. The Debtors asserted that this was not significant to the Kenton County Airport Authority because both Alamo and National had always paid more in percentage rent than the MAG and the combined operation would certainly result in ANC paying percentage rent greater than the National MAG alone.

is a party to the Concession Agreements which are the subject to the Motions. As such, the Debtors argue that Hertz and Avis do not have standing to be heard. *See, e.g., In re James Wilson Assocs.,* 965 F.2d 160, 169 (7th Cir.1992) (creditor which held mortgage and assignment of rents in building which debtor had sold and leased back from landlord had no standing to enforce provision of § 365 which requires debtor to assume or reject an unexpired lease of non-residential real estate within 60 days of bankruptcy filing); *Southern Boulevard, Inc. v. Martin Paint Stores (In re Martin Paint Stores),* 207 B.R. 57, 61–62 (S.D.N.Y.1997) (tenant of landlord had no standing to object to assumption and assignment of lease by debtor).

In the *James Wilson* case, the Seventh Circuit acknowledged that there was a split of authority on whether creditors other than landlords have standing to enforce section 365(d), but stated that:

> we find it very difficult to see who might be an intended beneficiary of this provision other than the lessor, and we therefore side with the First Circuit [in *In re Dein Host, Inc.,* 835 F.2d 402 (1st Cir. 1987)]. The Second Circuit [in *International Trade Administ. v. Rensselaer Polytechnic Inst.,* 936 F.2d 744, 747 (2d Cir.1991)] considered standing only in its Article III sense: did the creditor have a tangible stake in enforcing the rule? And of course it did, as [the mortgagee] does here. But there is more to standing. If as here the lessor is content to allow the lease to continue, no other creditors suffer a harm of the kind that the provision was intended to head off. A rule that allows other creditors to complain that the lease was not assumed will simply provoke arid controversies over what formalities should be considered adequate for the assumption of a

lease—a matter between the lessor and the lessee.

*James Wilson,* 965 F.2d at 169.

The Seventh Circuit also rejected the mortgagee's argument that section 1109 of the Bankruptcy Code gave it standing as a creditor to raise and be heard on the issue, stating that "we do not think that [section 1109] was intended to waive other limitations on standing, such as that the claimant be within the class of intended beneficiaries of the statute that he is relying on for his claim, although a literal reading of section 1109(b) would support such an interpretation." *Id.*

In this case, the interests of Hertz and Avis are even less apparent than those of the creditor in the *James Wilson* case. Neither Hertz nor Avis is a creditor in this case. In fact, both are direct competitors of the Debtors at the airports in question. As such, they are more akin to the objector in the *Martin Paint* case.

In *Martin Paint,* a tenant of the commercial building in which the debtor was located objected to the debtor's motion to assume and assign its lease to an entity which would compete with the objector. The Court held that the objector had no standing to be heard on the debtor's decision to assume and assign its lease. Although acknowledging that the other tenant had a provision in its lease prohibiting the landlord from leasing space to a competitor and the debtor's lease had a provision limiting use of its space to the industry in which the debtor operated, the Court held that the objector lacked standing to enforce the landlord's rights under the lease with the debtor, even though it would directly affect its rights under its own lease. 207 B.R. at 61. In so holding, the Court stated:

> Thus, although section 1109(b) of the Code provides that a "party in interest" may appear and be heard on any issue, a

party claiming to be a party in interest must still satisfy the general requirements of the standing doctrine. *See In re James Wilson Assocs.*, 965 F.2d 160, 169 (7th Cir.1992). The doctrine of standing "embraces several judicially self-imposed limits on the exercise of federal jurisdiction, such as the general prohibition on a litigant's raising another person's legal rights ... and the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked." *Allen v. Wright*, 468 U.S. 737, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984).

*Martin Paint*, 207 B.R. at 61. In its decision, the *Martin Paint* Court also relied on the Second Circuit's decision in *Roslyn Sav. Bank v. Comcoach Corp. (In re Comcoach Corp.)*, 698 F.2d 571, 573 (2d Cir.1983):

> In *Comcoach*, the Court of Appeals for the Second Circuit held that the term "party in interest," for the purposes of lifting an automatic stay under Code section 362, includes only the debtor and its creditors. A creditor, under the Code, is one who has a claim against the debtor or the estate.... The concept does not, according to the Second Circuit, encompass a creditor of one of the debtor's creditors.... Such a party may be deeply concerned about the bankruptcy proceeding, since the debtor's ability to pay its creditor may affect the creditor's ability to pay, in turn, its creditor. But the party's legal rights and interests can only be asserted against the debtor's creditor, not against the debtor, and hence it is not a "party in interest" under the Second Circuit's view of section 1109.

207 B.R. at 61 (citations omitted).

Under the above line of cases, it is clear that Hertz and Avis do not have standing to be heard on the Debtors' Motions to assume and assign the Concession Agreements to ANC. Neither Hertz nor Avis are creditors of the Debtors nor do they have any direct contractual or other legal relationship with the Debtors. They are merely competitors in the same industry. The rights they assert here are not their own, they are the rights of the Airport Authorities. Section 365 is designed to protect the rights of parties with whom debtors have contractual relationships, in this case the Airport Authorities. If the Airport Authorities choose not to oppose the Debtors' Motions, neither Hertz nor Avis have standing to assert the Airport Authorities' rights.

Avis and Hertz argue, however, that the Third Circuit has a more expansive view of standing in bankruptcy proceedings which is broad enough to encompass their interests in ensuring that the concessions at airports where they operate are granted in accordance with applicable law (bankruptcy and non-bankruptcy). They cite particularly the Third Circuit decision in *In re Amatex Corp.*, 755 F.2d 1034 (3d Cir.1985). However, the *Amatex* case is clearly distinguishable from this case and cannot be read for the broad proposition that parties who have no relationship to the debtors have standing. In *Amatex*, the Court held that future asbestos claimants against the debtor had standing to be represented in the debtor's chapter 11 proceeding. The Court noted that the examples of a party in interest contained in section 1109 (creditors, shareholders, committees, the debtor and trustee) are not exclusive and stated that:

> We conclude that future claimants are sufficiently affected by the reorganization proceedings to require some voice in them. Moreover, none of the parties currently involved in the reorganization proceedings have interests similar to those of future claimants, and therefore

future claimants require their own spokesperson. . . .

Accordingly, because of the adverse interests of the other parties, it would appear that future claimants require their own representatives.

*Id.* at 1042–43.

The interests of Avis and Hertz are not at all analogous to the interests of the future asbestos claimants in *Amatex.* Hertz and Avis do not now, and never will, have a direct claim against the Debtors. That is, they are not future potential claimants against the Debtors. Rather, the only interests Avis and Hertz have (if any) are their contractual interests vis-a-vis the Airport Authorities and the interests they assert that the Airport Authorities have against the Debtors. *Amatex* did not alter the general prohibition against one asserting the legal rights of others.

Furthermore, there is no basis in this case for Hertz and Avis to assert that there is no one who has standing in the case who can adequately represent the interests which Hertz and Avis seek to assert. In fact, the Airport Authorities have standing to assert those exact interests and, therefore, those interests are already adequately represented in the bankruptcy proceedings. Thus, in contrast to the situation in *Amatex,* the interests of Hertz and Avis are not without an advocate in the bankruptcy proceeding. Since they are not direct claimants against the Debtors and the interests they seek to assert are already represented in the proceedings, we conclude that Hertz and Avis have no standing to be heard in this case.

### B. *Prior Rulings*

The Debtors argue that all of the arguments raised by Hertz and Avis have been rejected in our prior decision with respect to the Cincinnati Motion. Consequently, they assert their Motions here must be granted without further ado. However, we see no basis to simply grant the Motions without consideration of the specific facts and legal arguments raised.

■ Res judicata (or claim preclusion) is a judicial doctrine which precludes a party from relitigating claims that were or could have been asserted in an earlier action. For res judicata to apply, three elements must be established: (1) a final judgment on the merits of a prior action; (2) involving the same parties or their privies; and (3) a subsequent suit based on the same cause of action. *See, e.g., Board of Trustees of Trucking Employees of New Jersey Welfare Fund, Inc.—Pension Fund v. Centra,* 983 F.2d 495, 504 (3d Cir.1992). Issue preclusion, or collateral estoppel, requires that the issue must actually have been litigated and decided by the prior order. *See, e.g., First Jersey National Bank v. Brown (In re Brown),* 951 F.2d 564, 569 (3d Cir.1991).

■ The law of the case doctrine provides that when a court actually decides a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case. However, that doctrine only applies to issues that were actually litigated and decided by the court. *See, e.g., AL Tech Specialty Steel Corp. v. Allegheny Int'l Credit Corp.,* 104 F.3d 601, 605 (3d Cir.1997) (an appellate court should generally decline to reconsider a question that was decided in a prior appeal); *Brown v. Flater,* 1996 WL 434192, at *2 (E.D.Pa. July 31, 1996) (law of case doctrine only applies to issues of law actually addressed on prior occasion).

■ We disagree with the Debtors' assertion that our prior Order on the Cincinnati Motion dictates our ruling on these Motions under any of the above doctrines. The Cincinnati Motion involved only the

234

Concession Agreement at that airport and was served only on the Kenton County Airport Authority. None of the four Airport Authorities with an interest in the four Motions before us had any notice of the Cincinnati Motion. Our findings with respect to the Cincinnati Motion are not binding on other Airport Authorities who were not parties to that Motion and who did not have an opportunity to be heard on it.[4]

Further, we made no ruling in the Cincinnati Motion that deals with the issues before us now, namely, whether the four Concession Agreements may be assumed and assigned as requested. Each Concession Agreement is different and each Airport Authority has a right to be heard on the specific issues relevant to its agreement, including the amount of any cure that is necessary and the ability of ANC to provide adequate assurance of future performance of the Concession Agreement. Consequently, we conclude that our prior ruling on the Cincinnati Motion is not dispositive of these Motions.

### C. Section 365(c)(1) Is Not Applicable

Although we find that Hertz and Avis do not have standing to be heard on these Motions, we will address the substantive objections raised by them at the hearing.[5] They assert initially that the assumption and assignment of the Concession Agreements are governed by section 365(c)(1), which requires the affirmative consent of the non-debtor contracting party.[6] The

Debtors assert that section 365(c)(1) is not applicable and that, therefore, compliance with the general provisions of section 365(f) are all that is required.

Section 365(c)(1) provides:

The trustee may not assume or assign any executory contract or unexpired lease of the debtor, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties, if—

(1)(A) applicable law excuses a party, other than the debtor, to such contract or lease from accepting performance from or rendering performance to an entity other than the debtor or the debtor in possession, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties; and

(B) such party does not consent to such assumption or assignment.

11 U.S.C. § 365(c)(1).

Hertz and Avis assert that in each instance, there are local statutes which permit the Airport Authorities to refuse to accept service from parties other than the Debtors. The local statutes they cite provide generally that no concession or commercial activity may be undertaken at the airport without the written permission of the Airport Authorities. See, e.g., Clark County, Nevada Code § 20.04.040; Nev. Rev.Stat. §§ 496.080, 496.090; City Code of Melbourne §§ 3.25, 6–4, 6–96, 6–100; Fla.Stat. § 332.08(3); City Code of Houston § 9–181; Tenn.Code §§ 42–3–112, 42–

---

4. In fact, for the same reasons we find that Hertz and Avis do not have standing to be heard on the present Motions, we would conclude that the Airport Authorities here did not have standing to be heard on the Cincinnati Motion: they are not parties to the Cincinnati Concession Agreement.

5. We do so because we reserved ruling on the issue of standing at the hearing and permitted

Hertz and Avis to present evidence and argument. However, we will not permit them to be heard in the future on similar motions where they have no standing.

6. None of the Airport Authorities have affirmatively consented to the Debtors' Motions, although none have objected.

4–107(16); Memphis City Code §§ 3–16, 3–60.[7]

Hertz and Avis assert that the statutes cited above are identical to the statute at issue in the *Braniff Airways* case. *See, e.g., In re Braniff Airways, Inc.,* 700 F.2d 935 (5th Cir.1983). The Fifth Circuit in *Braniff Airways* found that similar language (providing that no one may engage in commercial activity at National Airport without the approval of the FAA) mandated that section 365(c)(1) applies to any assumption or assignment of a lease of an aircraft gate at that airport. *Id.* at 943.

The Debtors assert, however, that the statutes in question are not applicable laws pursuant to section 365(c)(1). The Debtors note that all the statutes cited provide nothing more than that the Airport Authority will be the entity with whom concessionaires and others doing business at the airport must contract. None of the statutes expressly prohibit assignment of concession agreements and none expressly excuse the airport authority from accepting performance from an assignee of a concessionaire.

In determining whether section 365(c)(1) is applicable, we must first read it in conjunction with section 365(f). Section 365(f) provides that a debtor may assume and assign a contract, notwithstanding language of the contract or applicable non-bankruptcy law which forbids assignment. In contrast, section 365(c)(1) prohibits assignment if applicable non-bankruptcy law forbids it. These sections are, therefore, inconsistent.

The Ninth Circuit recognized this inherent conflict between section 365(f) and section 365(c)(1).

The potential conflict between subsection (c)(1) and (f)(1) arises from their respective treatments of "applicable law." The plain language of subsection (c)(1) bars assumption (absent consent) whenever "applicable law" would bar assignment. Subsection (f)(1) states that, *contrary provisions in applicable law notwithstanding,* executory contracts may be assigned.... The Sixth Circuit has credibly reconciled the warring provisions by noting that "each subsection recognizes an 'applicable law' of markedly different scope." ... Subsection (f)(1) states the broad rule—a law that, as a general matter, "prohibits, restricts, or conditions the assignment" of executory contracts is trumped by the provisions of subsection (f)(1).... Subsection (c)(1), however, states a carefully crafted exception to the broad rule—where applicable law does not merely recite a general ban on assignment, but instead more specifically "excuses a party ... from accepting performance from or rendering performance to an entity" different from the one with which the party originally contracted, the applicable law prevails over subsection (f)(1).... In other words, in determining whether an "applicable law" stands or falls under § 365(f)(1), a court must ask *why* the "applicable law" prohibits assignment.

165 F.3d at 751–52 (citations omitted).

Consequently, the majority of courts have found section 365(c)(1) applicable only where the identity of the contracting party is crucial under the applicable law because it is a personal services contract or for public safety reasons. *See, e.g., Perlman v. Catapult Entertainment, Inc. (In re Catapult Entertainment, Inc.),* 165 F.3d

---

**7.** Avis also asserts one of the statutes expressly prohibits assignment of any contract awarded by the Airport Authorities without their written permission. *See, e.g.,* Nev.Rev. Stat. § 332.095. As the Debtors note, however, this statute is not applicable to the award of concessions, but instead applies only to the government's purchase of goods.

747, 750–51 (9th Cir.1999) (patent law renders non-exclusive patent licenses personal and non-assignable under § 365(c)(1)); *City of Jamestown v. James Cable Partners, L.P. (In re James Cable Partners, L.P.)*, 27 F.3d 534, 537 (11th Cir.1994) (city ordinance prohibiting assignment of cable franchise without city approval was mere general prohibition against assignment and insufficient to constitute applicable law under section 365(c)(1)); *In re West Electronics, Inc.*, 852 F.2d 79, 83 (3d Cir.1988) (contract for the manufacture of military equipment was personal services contract which was non-assignable under government anti-assignment statute and § 365(c)(1)); *Cajun Elec. Members Comm. v. Mabey (In re Cajun Elec. Power Co-op., Inc.)*, 230 B.R. 693, 708–09 (Bankr.M.D.La. 1999) (state law that prohibited transfer of assets without majority vote of the members of the electric cooperative did not prevent assumption and assignment of contracts where identity of party was not central to the contract); *In re Lil' Things, Inc.*, 220 B.R. 583, 591 (Bankr.N.D.Tex. 1998) (§ 365(c)(1) not applicable to Texas statute which is "merely a general prohibition against assignments made without consent of the lessor"); *In re Fulton Air Service, Inc.*, 34 B.R. 568, 573 (Bankr. N.D.Ga.1983) ("A lease for improved real property does not constitute a contract for nondelegable personal services" and therefore does not fall under exception of § 365(c)(1)).

▮  Therefore, we conclude that it is not sufficient for application of section 365(c)(1) that the statute merely require approval by the contract party to any assignment. To so hold would allow any governmental unit to eviscerate section 365(f) simply by passing a statute which requires that a contracting party consent to any assignment of its contract. In fact, the Court in *In re Federated Dep't Stores,*

*Inc.*, 126 B.R. 516 (Bankr.S.D.Ohio 1990) was faced with that exact scenario when it was asked whether a Texas statute which prohibited the subleasing of any lease without the landlord's consent was applicable law for the purposes of section 365(c)(1). The Court held that:

> [T]he Texas contract law at issue here is precisely what Congress did *not* intend to protect when it enacted § 365(c). [The landlord] wants this Court to elevate Texas contract law to the kind of law that regulates important public rights, such as the public air safety in *Braniff,* or the regulation of government contracts for production of military equipment, as in *West Electronics.* In contrast the Texas law here deals with private rights between parties with no overriding public policy implications . . . . [The landlord's] interpretation of § 365(c)(1) runs contrary to congressional intent favoring lease assignments . . . . By [the landlord's] reasoning, any governing authority could promulgate laws which totally prohibit the assumption and assignment of executory contracts or leases, thereby thwarting the legislative purpose of § 365 altogether.

126 B.R. at 518–19.

Consequently, we follow the majority of courts addressing this issue and conclude that, for section 365(c)(1) to apply, the applicable law must specifically state that the contracting party is excused from accepting performance from a third party under circumstances where it is clear from the statute that the identity of the contracting party is crucial to the contract or public safety is at issue.

▮  In this case, we do not find that the statutes in question fit the exception of section 365(c)(1). The language cited by Hertz and Avis merely provides that it is the Airport Authority with whom a concessionaire must deal in order to operate.

Although the concessions are located at the airports, public safety concerns are not implicated by the question of who runs a car rental service as opposed to who operates an airline, as was the case in *Braniff Airways*.[8] Furthermore, none of the statutes applicable to the Concession Agreements cited by Hertz or Avis preclude assignment of those Agreements or even require the Airport Authorities' consent to such an assignment. Thus, the statutes themselves do not demonstrate any overriding concern for the exact identity of the party with whom the Airport Authorities contract.

Hertz and Avis argue, however, that each of the concessionaires are subject to public bidding and other requirements that evidence that the Airport Authorities are concerned about the specific identities of the parties with whom they contract.

However, in contrast to a personal services contract where generally only one party will do (*i.e.*, Pavarotti) the concessions in question here were awarded to numerous car rental operators. Awards were made generally on the basis of who bid the highest MAG. Further, the fact that the statutes do not prohibit assignment of the Concession Agreements belies their characterization as "personal." It does not appear that in awarding a contract to National, the Airport Authorities wanted only National (as opposed to Hertz or Avis or Alamo) at that specific location.

As one of the Debtors' secured creditors, Liberty has raised an additional indicia of the free assignability of the Concession Agreements. Liberty notes that many of the Airport Authorities, as a condition to making an award, require the concessionaires to post a surety bond to secure their performance. Under surety law, in the event of a default by the concessionaire, the surety has the right (and obligation) to complete performance under the agreement. *See, e.g., Pearlman v. Reliance Ins. Co.*, 371 U.S. 132, 137, 83 S.Ct. 232, 9 L.Ed.2d 190 (1962) (recognizing surety's common law rights of subrogation in event it completed performance of contract); *In re Modular Structures, Inc.*, 27 F.3d 72, 74 n. 1 (3d Cir.1994) (on default of contractor, surety steps into its shoes to complete performance).

█ Our conclusion that the identity of the party was not crucial is bolstered by the fact that none of the Airport Authorities has opposed the relief requested in the Motions. They are apparently content to have ANC substituted as a party to the Concession Agreements. None has raised identity, performance or public safety concerns with the proposed assignment. Consequently, we conclude that section 365(c)(1) is not applicable to the Concession Agreements.[9]

**D.  *Section 365(f) Requirements Are Met Here***

█ In order to assume and assign an executory contract or unexpired lease

---

8. The Debtors note that the 1992 amendments to section 365(c) added subsection 4 which restricts assignment of aircraft terminals or gates if there is not consent of the lessor *unless* the debtor seeks to assign *all* the gates it leases at that airport in which case, presumably, no consent is necessary. 11 U.S.C. § 365(c)(4). The Debtors argue that if section 365(c)(1) already forbade assignment of such leases, the amendment would not have been necessary.

9. Even if section 365(c)(1) were applicable, it could be waived by the Airport Authorities. *See, e.g., Metropolitan Airports Comm'n v. Northwest Airlines, Inc. (In re Midway Airlines, Inc.)* 6 F.3d 492, 496 (7th Cir.1993) (where contract permits assignment, airport authority has waived right to object to assignment under section 365).

under section 365(f), the debtor must establish that the decision is one made in its sound business judgment. *See, e.g., In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D.Del.1999). In this case the Debtors have established such a sound business purpose for consolidating the National and Alamo operations at the airports. Such consolidation will result in considerable expense reduction (almost $4.5 million annually for these four airports). These savings would be realized without any anticipated reduction in revenues because National and Alamo attract different customers (business versus leisure). Neither Hertz nor Avis dispute this; in fact, it is precisely because the consolidation will give the Debtors a competitive advantage that Hertz and Avis object.

Having met the threshold requirement of a sound business purpose, the Debtors must also cure any existing defaults and provide adequate assurance of future performance of the assigned contracts. The Debtors have agreed to cure any defaults (pre- or post-petition) on the contracts to be assumed and no objection has been raised on this point.

### a. *Adequate Assurance of Future Performance*

■ Hertz and Avis argue, however, that the Debtors cannot show adequate assurance of future performance. They note that ANC is merely a holding company which has never operated a car rental concession and has no ability to perform the Concession Agreements. On this point, the Debtors' CEO testified that ANC has an oral license to operate under the National and Alamo brands and that former National and Alamo personnel who had operated at the airports have been hired by ANC to conduct its operations at the same airports. Further, he testified that the projected savings of almost $4.5

million annually will improve the condition of ANC so that it is much more financially secure than either National or Alamo are today, making ANC able to perform the obligations due under the Concession Agreements.

Hertz and Avis do not dispute these assertions. They argue that adequate assurance of future performance is demonstrated only if ANC is able to operate under National and Alamo's tradenames. If not, the savings will not materialize and it makes no sense to assign the National Concession Agreements or reject the Alamo Concession Agreements. The Debtors' witness conceded this.

Because we find below that ANC will be able to operate under both names, we conclude that the evidence presented by the Debtors establishes adequate assurance of future performance of the Concession Agreements by ANC.

### b. *Modification of Concession Agreements*

■ Hertz and Avis argue that the Debtors' Motions cannot be granted because they seek to modify the Concession Agreements they are assuming. Section 365(f) does not permit this but requires that a debtor assume the contract *cum onere* without any change. As the Third Circuit stated in *In re Italian Cook Oil Corp.*:

> The [debtor], however, may not blow hot and cold. If he accepts the contract he accepts it cum onere. If he receives the benefits he must adopt the burdens. He cannot accept one and reject the other.

190 F.2d 994, 997 (3d Cir.1951). *See also City of Covington v. Covington Landing L.P.*, 71 F.3d 1221, 1226 (6th Cir.1995) (neither debtor nor court has authority to modify material terms of a lease assigned); *In re Allegheny Health, Educ. & Research Found.*, 265 B.R. 88, 113 (Bankr.W.D.Pa.

2001) (bankruptcy court has no jurisdiction under § 365 to alter, enlarge or redefine the terms and conditions of the original contract assumed and assigned); *In re Washington Capital Aviation & Leasing,* 156 B.R. 167, 173 (Bankr.E.D.Va.1993) (assumption of unexpired lease pursuant to § 365 does not augment a debtor's right under the agreement); *In re Mellen,* 79 B.R. 385, 387 (Bankr.N.D.Ill.1987) (neither debtor nor court has authority under § 365 to expand or vary terms of an existing contract or unexpired lease); *In re Mushroom Transp. Co.,* 78 B.R. 754, 759 (Bankr.E.D.Pa.1987) (executory contracts and unexpired leases must be assumed in their entirety, subject to both benefits and burdens thereunder); *In re Air Vectors Assocs.,* 53 B.R. 668, 687 (Bankr.S.D.N.Y. 1985) (bankruptcy court is without authority to rewrite the terms of a lease); *In re Easthampton Sand & Gravel Co.,* 25 B.R. 193, 198 (Bankr.E.D.N.Y.1982) (equity will not countenance debtor's attempt to relieve itself of conditions which are clearly vested by the contracting parties as an essential part of their bargain and which do not contravene overriding federal policy).

The Third Circuit has summarized the well-established law of assignment as follows:

> [A]bsent a provision stating otherwise, assignment of a contract will result in the assignee stepping into the shoes of the assignor with regard to the rights that the assignor held and not in an expansion of those rights to include those held by the assignee. "An assignment does not modify the terms of the underlying contract. It is a separate agreement between the assignor and the assignee which merely transfers the assignor's contract rights, leaving them in full force and effect as to the party changed.... " "[A]n assignment is intended to change only who performs an obligation, not the obligation to be performed." " 'An assignee obtains only the right, title and interest of his assignor at the time of the assignment, and no more.' "

*Medtronic Ave., Inc. v. Advanced Cardiovascular Sys., Inc.,* 247 F.3d 44, 60 (3d Cir.2001) (citations omitted).

The material modification of which Hertz and Avis complain is the fact that ANC will be operating under two brand names. Hertz and Avis assert that the bidding requirements and the Concession Agreements forbid this. We disagree.

Neither Hertz nor Avis cite to *any* provision of *any* of the Concession Agreements (or to the requests for bids pursuant to which the Concession Agreements were awarded) which expressly forbid the operation of a car rental agency which uses two brand names, *e.g.,* dual branding. In the absence of such express language we cannot conclude that the assignment of the Concession Agreements to ANC which will operate under two brands modifies (or is prohibited by) those Agreements.

Hertz and Avis argue, however, that various provisions of the Concession Agreements support a conclusion that dual branding is a modification of the agreement. First, they point to provisions which prohibit any changes to operations without written approval of the Airport Authority. (Exhibit D–2 at § 1.9.6.) Such a broad provision though could be read to prohibit *any* assignment of the Concession Agreement (since the assignee's operations would not be identical to the original concessionaire's), and thus is not enforceable. 11 U.S.C. § 365(f). *See, e.g., In re Rickel Home Ctrs., Inc.,* 240 B.R. 826, 832 (D.Del. 1998) (lease term which restricted use to home improvement centers was unenforceable as de facto anti-assignment clause); *In re Jamesway Corp.,* 201 B.R. 73, 77

(Bankr.S.D.N.Y.1996) (lease provision that required debtor to pay landlord a percentage of the profits realized from assignment of leases had the practical effect of restricting, conditioning, or prohibiting debtor's right to assign lease and was therefore unenforceable under § 365); *In re Mr. Grocer, Inc.,* 77 B.R. 349, 352 (Bankr. D.N.H.1987) (right of first refusal granted to landlord was unenforceable against debtor seeking to assume and assign lease because provision restricted or conditioned assignment of the lease).

Second, Hertz and Avis assert the Concession Agreements state that the concessionaires may only operate under their own national tradename. (Exhibit D–3 at ¶ 12.) They emphasize that tradename is singular thereby precluding the use of more than one brand. The Debtors argue that, if the provision were mean to preclude the use of more than one tradename, then Hertz and Avis would be in default since they both operate under more than one registered tradename: Hertz and Hertz Gold and Avis and Avis Preferred. We agree with the Debtors. The provision does nothing more than permit the concessionaire to operate under a tradename or tradenames. It does not preclude a concessionaire from using more than one tradename.

Third, Hertz and Avis argue that ANC may not operate because it did not obtain the Concession Agreements pursuant to the competitive bidding requirements. We reject this argument. The Concession Agreements in question *were* awarded pursuant to the competitive bidding requirements of the respective statutes. They were awarded to National. National seeks merely to assign those contracts to ANC. None of the statutes prohibit assignment *nor* do they condition assignment on complying with competitive bidding require-

ments. Therefore, the objections are without merit.

## IV. *CONCLUSION*

For the foregoing reasons, we grant the Debtors' Motions to Reject the Concession Agreements of Alamo and to Assume and Assign the Concession Agreements of National to ANC at the following airports: Melbourne, Florida; Las Vegas, Nevada; Memphis, Tennessee; and Houston, Texas (the Hobby Airport).

An appropriate order is attached.

### *ORDER*

AND NOW, this **3RD** day of **MAY, 2002,** upon consideration of the Motions of the Debtors for authority to assume and assign to ANC Rental Corporation certain executory contracts and leases of National Car Rental System, Inc. and to reject certain executory contracts and leases of Alamo Rent–a–Car, L.L.C. at the Melbourne, Florida, airport, the McCurran/Las Vegas International Airport, the Memphis, Tennessee, airport and the Houston, Texas, Hobby airport, for the reasons set forth in the accompanying Opinion, it is hereby

**ORDERED** that the Motions are **GRANTED;** and it is further

**ORDERED** that notwithstanding anything to the contrary herein, Liberty Mutual Insurance Company is hereby deemed to have reserved and has in no way waived any and all rights, interest, defenses or remedies under or in connection with surety bonds issued by Liberty, or to be issued by Liberty, including without limitation, those which arise under contract, statute or by operation of law, by virtue of equitable lien, equitable subrogation or otherwise.