In re C.W. MINING COMPANY, doing business as Co–Op Mining Company, Debtor.

C.O.P. Coal Development Company, Appellant,

v.

C.W. Mining Company, Kenneth A. Rushton, Trustee, Aquila, Inc., and Hiawatha Coal Company, Appellees.

BAP No. UT–09–018.
Bankruptcy No. 08–20105.

United States Bankruptcy Appellate Panel of the Tenth Circuit.

Feb. 3, 2010.

Kim R. Wilson, of Snow, Christensen & Martineau, Salt Lake City, UT (F. Mark Hansen, of F. Mark Hansen, P.C., Salt Lake City, UT, on the brief), for Appellant C.O.P. Coal Development Company.

Brent D. Wride, of Ray Quinney & Nebeker, Salt Lake City, UT (Keith A. Kelly, with him on the brief) for Appellee Aquila. Inc., Michael N. Zundel of Prince, Yeates & Geldzahler, Salt Lake City, UT (Richard H. Thornton and Christopher A. Jones with him on the brief), for Appellee Kenneth A. Rushton.

Before MICHAEL, BROWN, and ROMERO, Bankruptcy Judges.

## OPINION

BROWN, Bankruptcy Judge.

This appeal centers on a non-residential lease of real property and whether that lease is property of Debtor's estate and assumable by the Chapter 7 Trustee under 11 U.S.C. § 365.[1] The lease allows Debtor to operate a coal mine in Utah. The bankruptcy court determined that the lease was property of Debtor's estate and gave the Chapter 7 Trustee additional time to assume or reject it. The coal mine lessor, C.O.P. Coal Development Company ("COP"), contends the bankruptcy court's ruling was erroneous because the lease terminated either on the day the involuntary petition was filed or during the gap period when Debtor contends it sold its assets and relinquished its rights under the lease to another party. Even if the lease did not terminate, COP contends it is not assumable under 11 U.S.C. § 365(c)(1) as a non-assignable, personal services contract. For the reasons set forth below, we AFFIRM.

## I. Background

### A. Pre–Bankruptcy

Debtor is a Utah corporation that operates the Bear Canyon Mine in Emery

---

1. Unless otherwise specified, all references to "Sections" and "§" are to Title 11, United States Code.

County, Utah, pursuant to a lease with the owner of the mine, COP. Debtor first leased the mine from COP in 1997, when it entered into a Coal Operating Agreement (the "Lease") with COP. Under the Lease, COP granted Debtor the exclusive right to mine and remove coal from various tracts of land, including the Bear Canyon Mine, for a period of 25 years. In exchange, Debtor agreed to pay royalties to COP on a monthly basis.

The relationship between Debtor and COP is more than mere lessor-lessee. Although COP maintains there is no legal relationship between itself and Debtor, both entities are owned and operated, at least in part, by various members of the Kingston family and members of the Davis County Cooperative, a non-profit entity.[2] The Davis County Cooperative, Debtor and COP share various common directors, officers, shareholders and registered agents. Carl Kingston is the registered agent for Debtor and COP, is a member of the Davis County Cooperative, and has acted as attorney for Debtor.[3] Carl Kingston's cousin, Joe Kingston, is the president and a shareholder of COP.[4] Joe Kingston's brother, Paul Kingston, is a shareholder of Debtor and COP, as well as the trustee (akin to the CEO) of the Davis County Cooperative.[5] Charles Reynolds, the president of Debtor since 2004, is a member of the Davis County Cooperative.[6] John Gustafson, the vice president of Debtor and one of its shareholders, sits on the board of directors of the Davis County Cooperative.[7] Rachel Young, sister of Paul Kingston and Joe Kingston, is a shareholder of Debtor and formerly a shareholder of COP.[8] COP disputes that any of these connections gave it the ability to control Debtor.

Between late 2003 and 2005, a contract dispute arose between the Debtor and one of its creditors, Aquila, Inc. Aquila filed a lawsuit against Debtor in federal district court in Utah (the "USDC"). Debtor was represented by Carl Kingston in the lawsuit. On October 30, 2007, Aquila obtained a $24 million dollar judgment against Debtor. After obtaining its judgment, Aquila began collection efforts in late 2007.

Also during late 2007, Debtor failed to make its rent payments to COP. Debtor maintains it was experiencing financial difficulties at the time, partly related to Debtor's attempts to change its mining method from continuous mining to long-wall mining. On November 9, 2007, COP sent Debtor a notice of default (the "Default Notice") pursuant to the default provision of the Lease. The default provision of the Lease provides:

> If [Debtor] shall not comply with any of the provisions, or covenants, or agreements herein written and contained, and such default shall continue for a period of 60 days after service of written notice,

---

**2.** *See In re C.W. Mining Co.*, No. 08–20105, 2009 WL 1118717 at *2, n. 3 (Bankr.D.Utah April 23, 2009). The exact nature and purpose of the Davis County Cooperative was not revealed at trial.

**3.** *Transcript of March 9, 2009, Hearing ("Mar. 9 Tr.")* at 348, 368, *in* Appellant Appx. Vol. 4 at 1048, 1068.

**4.** *Transcript of February 27, 2009, Hearing ("Feb. 27 Tr.")* at 196, *in* Appellant Appx. Vol. 3 at 801; *In re C.W. Mining Co.*, 2009 WL 1118717 at *2, n. 4.

**5.** *Feb. 27 Tr.* at 220, *in* Appellant Appx. Vol. 3 at 825; *Mar. 9 Tr.* at 369, 490, *in* Appellant Appx. Vol. 4 at 1069, 1190.

**6.** *Transcript of March 10, 2009, Hearing ("Mar. 10 Tr.")* at 686, *in* Appellant Appx. Vol. 5 at 1387.

**7.** *Mar. 9 Tr.* at 348, 369, *in* Appellant Appx. Vol. 4 at 1048, 1069.

**8.** *Mar. 9 Tr.* at 451–52, *in* Appellant Appx. Vol. 4 at 1151–52.

by certified or registered mail, by [COP] identifying the default and specifying with reasonable particularity the nature and extent thereof, then and in such event this Agreement may be terminated and all of he rights of the [Debtor] shall cease and be wholly determined and [COP] may at once take possession of any or all of the properties herein described.[9]

COP's Default Notice informed Debtor that it was in default under the terms of the Lease, spelled out the specific defaults, and explained the steps that the Debtor needed to take to cure those defaults. The Default Notice did not specifically mention an intention to terminate the Lease or a deadline for curing the defaults. Nevertheless, Debtor and COP apparently believed that the Default Notice triggered the commencement of the 60–day cure period under the Lease.

Aquila considered the Lease to be a valuable asset from which it could collect its judgment, and was concerned that the Debtor might attempt to transfer its assets or terminate the Lease to prevent Aquila from executing and recovering its judgment. At Aquila's request, on December 19, 2007, the USDC in Utah entered a Supplemental Order in Aid of Enforcement of Judgment (the "Supplemental Order") in support of Aquila's $24 million judgment. The Supplemental Order precluded the Debtor from taking "any action that may result in the termination of [the Lease]." [10]

On January 3, 2008, COP sent a letter to Debtor that provided: "You are hereby notified that as per the terms of the [Lease] between [COP] and [the Debtor], the [Lease] will be canceled at the end of the notice period unless the default is cured prior to the end of the 60 day notice period." [11] Sixty days after service of the Default Notice was January 8, 2008. In response to the letter, Debtor engaged in negotiations with COP. COP sent two letters to Debtor dated January 5, 2008 and January 6, 2008 ("January 5 & 6 Letters") in which COP set forth lists of terms that the Debtor would have to comply with in order to continue mining and requested Debtor's agreement to those terms. In spite of the Supplemental Order that precluded the Debtor from taking any action that might result in the termination of the Lease, Debtor's president signed the letters and agreed to COP's terms. In so doing, Debtor acknowledged that "If [Debtor] fails to pay to COP, by wire transfer, before the close of business on January 8, 2008 all amounts in default under the [Lease], the [Lease] shall be forever terminated, without further notice," [12] and that upon such termination Debtor would have no rights, title, claim or interest in the Lease or the coal mine.[13] COP and the Debtor then purported to enter into a new Coal Operating Agreement on January 6, 2008, under which the Debtor would continue to have the right to mine coal at the Bear Canyon Mine.

### B. Bankruptcy Proceedings

On January 8, 2008 (the "Petition Date"), *prior to the close of business*, Aqui-

---

**9.** *Coal Operating Agreement* at ¶ 9, *in* Appellant Appx. Vol. 2 at 375.

**10.** *Supplemental Order in Aid of Enforcement of Judgment* at ¶ 4, *in* Appellant Appx. Vol. 2 at 556.

**11.** *Letter dated January 3, 2008, in* Appellant Appx. Vol. 2 at 391.

**12.** *Letter dated January 6, 2008* at ¶ 5, *in* Appellant Appx. Vol. 2 at 398.

**13.** *Letter dated January 5, 2008* at ¶ 1, *in* Appellant Appx. Vol. 2 at 394.

la and other petitioning creditors filed an involuntary Chapter 11 bankruptcy petition against Debtor. After the Petition Date, the Debtor continued to operate the Bear Canyon Mine under § 303(f). On May 9, 2008, the Debtor received another letter from COP (the "May 9 Letter") reminding Debtor that the Lease had been terminated, asserting that the Debtor had failed to meet the conditions to accept the new coal operating agreement, and notifying the Debtor that unless all terms of acceptance were met by June 5, 2008, the Debtor must vacate the Bear Canyon Mine by July 5, 2008.[14] It was shortly after receipt of the May 9 Letter that Debtor began contemplating a sale of the Debtor's assets to a third party.

Debtor contacted Hiawatha Coal Company, Inc. ("Hiawatha") in late May 2008 about a possible sale of Debtor's assets. Hiawatha, which occupied a mine permit area adjacent to the Bear Canyon Mine, had previously mined coal from aboveground slurry residue, but did not begin underground coal mining until it purportedly took over Debtor's operations in June 2008. There are various interrelationships among Hiawatha, Debtor, COP and the Kingston family. Elliot Finley ("Finley"), the president of Hiawatha, is a member of the Davis County Cooperative, as is Elliot's brother Nate Finley, the vice president of Hiawatha.[15] Prior to the purported sale of assets, Debtor and Hiawatha shared the same registered address and agent.[16] Paul Kingston is a shareholder of the Debtor, COP, and Hiawatha.[17] Charles Reynolds, in addition to acting as the president of Debtor since 2004, and the current mine manager for Hiawatha, is a member of the Davis County Cooperative, along his brother Mark Reynolds, who is a mining engineer for Hiawatha and for Debtor.[18]

After a period of negotiations, facilitated in part by Paul Kingston and Carl Kingston, Debtor and Hiawatha executed a Purchase and Sale Agreement (the "Sale Agreement") dated June 24, 2008. The Sale Agreement contemplated a sale with no cash consideration, but instead the alleged assumption of certain secured debts owed to various entities, all of which have ties to the Davis County Cooperative and the Kingston family. Hiawatha did not agree to assume Aquila's judgment. The sale of assets purportedly included certain of Debtor's permits, including the permit by which the Debtor was authorized by the Utah State Division of Oil, Gas and Mining ("DOGM") to conduct mining operations. As part of that deal with Hiawatha, Debtor also allegedly made a "voluntary relinquishment" of its coal mining leases to Hiawatha. Debtor supposedly documented its voluntary relinquishment in a June 23, 2008, letter to COP. Both Aquila and the Chapter 7 Trustee would later contest the validity and date of the sale, as well as Debtor's "voluntary relinquishment."

Not all of the sale documentation was completed and executed in late June 2008, including the documentation necessary to cause various governmental authorities, including DOGM, to transfer the Debtor's

**14.** *Letter dated May 9, 2008, in* Appellant Appx. Vol. 2 at 413.

**15.** *Mar. 10 Tr.* at 621–23, *in* Appellant Appx. Vol. 5 at 1323–25.

**16.** *Id.* at 623, *in* Appellant Appx. Vol. 5 at 1325.

**17.** *Mar. 10 Tr.* at 609, *in* Appellant Appx. Vol. 5 at 1311; *Feb. 27 Tr.* at 220, *in* Appellant Appx. Vol. 3 at 825; *Mar. 9 Tr.* at 490, *in* Appellant Appx. Vol. 4 at 1190.

**18.** *Feb. 27 Tr.* at 26, *in* Appellant Appx. Vol. 3 at 631; *Mar. 10 Tr.* at 686, *in* Appellant Appx. Vol. 5 at 1387.

right to mine coal to Hiawatha. In addition, Debtor failed to transfer its reclamation bond to Hiawatha. The account name for at least one of the vendors continued to show Debtor's name. Debtor's on-road vehicles were never retitled to Hiawatha. After the purported sale, the majority of Debtor's employees went to work for Hiawatha. The Bear Canyon Mine continued to be mined using the equipment previously used by Debtor.

Shortly after Debtor's purported sale to Hiawatha, Aquila filed two substantive motions. The first was a Motion for Order of Civil Contempt Against Standard Industries, Inc. and C.O.P. Development Company for Violations of the Automatic Stay (the "Contempt Motion"). The Contempt Motion alleged COP violated the stay by, among other acts, attempting to cancel the Lease and threatening to evict Debtor from the Bear Canyon Mine. On July 23, 2008, the bankruptcy court entered an order granting Aquila's Contempt Motion (the "Contempt Order"). The Contempt Order found that "All actions taken by [COP] to terminate [the Lease] after the petition date are hereby adjudged and declared to be null and void and of no force and effect and as such the [Lease] was not terminated by [COP] after the petition date and remains a valid agreement between the parties." [19]

Aquila also filed a Motion for Order Preserving and Protecting Assets of Bankruptcy Estate and Requesting Notice and Hearing in Connection With Debtor's Purported Sale of Substantially All Operating Assets to a Related Entity (the "Preservation Motion"). The Preservation Motion sought to void Debtor's sale to Hiawatha as violative of the USDC's Supplemental Order. After an evidentiary hearing, the bankruptcy court entered an order on August 7, 2008, denying the Preservation Motion in part and granting it in part (the "Preservation Order"). In the Preservation Order, the bankruptcy court held that § 303(f) gave Debtor the power to sell its assets without seeking court approval under § 363. The court also concluded that enforcement of the Supplemental Order had been stayed by § 362, since the Supplemental Order was issued to aid Aquila in its attempt to collect on its judgment. Aquila was thus required to move to lift the stay to enforce the Supplemental Order during the gap period, which it had not done. As such, the bankruptcy court concluded that it could not enforce the Supplemental Order "to prevent the transfer that has already occurred." [20] However, the bankruptcy court also ordered that any subsequent attempt by Debtor to use, transfer, or dispose of assets outside the ordinary course of business was subject to the provisions of § 363, including any portion of its sale agreement with Hiawatha that had not yet been consummated.

On September 29, 2008, the bankruptcy court entered the Order for Relief. Approximately one month later, on the motion of Aquila, the court converted Debtor's case to Chapter 7 and appointed Mr. Rushton as Chapter 7 Trustee.

Once appointed, the Trustee began investigating assets perhaps available for distribution to creditors, including the Lease. On January 5, 2009, Trustee filed his Motion to Extend Time for Trustee to Assume or Reject Executory Contracts or Unexpired Leases of Debtor (the "Extension Motion"), seeking to extend the deadline for the Trustee to assume or reject executory contracts. COP then filed a Motion to Require the Trustee to Assume

---

**19.** *Contempt Order* at 4 ¶ 9, *in* Trustee Appx. at 48.

**20.** *Preservation Order* at 7, *in* Appellant Appx. Vol. 2 at 597.

or Reject Lease (the "Assumption Motion"). In the Assumption Motion, COP argued that there was no unexpired lease between COP and Debtor, but if a lease did exist, it was not assumable or assignable.

After a four-day evidentiary hearing, the bankruptcy court entered its orders granting the Trustee's Extension Motion and denying COP's Assumption Motion. In its accompanying Memorandum Decision to these orders, the bankruptcy court made extensive factual findings. The court first considered COP's argument that the Lease was not assumable because it constituted a personal service contract under § 365(c)(1)(A). The court rejected this argument, concluding that the Lease bore no resemblance to a personal service contract and, by its terms, was assignable.

The court then addressed COP's argument that the Lease terminated and was excluded from the estate under § 541(b)(2) and not assumable under § 365(c)(3). The court acknowledged that a trustee does not have the authority to assume an unexpired nonresidential lease that terminated prior to the bankruptcy. However, the court concluded the Lease did not terminate prepetition because COP's default notice stated the lease would terminate at the close of business on January 8, 2008. The involuntary petition was filed at 3:36 p.m. on January 8, 2008, before termination occurred. As such, the court concluded that Debtor's interest in the Lease became property of the estate. The court rejected COP's argument that January 5 & 6 Letters cancelled the Lease because such prepetition actions were prohibited by the USDC's Supplemental Order. Next, the court rejected COP's argument that the Lease expired postpetition. The court ac-

knowledged that the automatic stay does not stop the termination of a contract that automatically expires by its own terms. The court found, however, that the terms of the Lease did not provide for automatic termination at the expiration of a default notice period. Rather, the Lease provides that COP *may* terminate the lease at the end of the 60–day notice period. By the time the 60–day cure period had run, the court concluded, the involuntary petition had been filed and the automatic stay prevented COP from terminating the Lease.

The court also rejected COP's argument that Debtor had voluntarily relinquished the Lease to Hiawatha prior to entry of the Order for Relief. Based on the evidence presented at trial, the court questioned the "timing and efficacy" of Debtor's purported relinquishment. Further, the court found any action by COP to exercise dominion or control over Debtor's assets would be a violation of the stay and therefore null and void. Thus, the court concluded that the evidence presented "simply does not support COP's contention that the Agreement terminated post-petition."[21] The bankruptcy court then found there was cause to extend the deadline for trustee to assume or reject.

After entry of the bankruptcy court's orders, COP filed a motion to amend the Memorandum Decision pursuant to Rule 52(b), in which it questioned several of the court's findings and conclusions and asked the court to defer adjudication of the estate's interest in the Lease. On April 23, 2009, the bankruptcy court entered an order denying in part and granting in part COP's motion to amend. The order denied the majority of COP's requested modifications but made some minor adjust-

**21.** *In re C.W. Mining Co.*, No. 08–20105, 2009 WL 1118717 at *12 (Bankr.D.Utah April 23, 2009).

ments to its factual findings. This appeal followed.

## II. Standard of Review

 Whether the Trustee is precluded by § 365(c) from assuming a lease is a question of law subject to *de novo* review.[22] Whether or not a contract is a personal services contract within the purview of § 365(c)(1) is a question of fact.[23] A bankruptcy court's determination whether property is included in the bankruptcy estate under § 541 is reviewed *de novo*,[24] as is the determination whether a party's actions have violated the automatic stay.[25] Interpretation of an unambiguous contract is a question of law and is subject to *de novo* review on appeal.[26]

## III. Discussion

On appeal, COP asserts three main arguments for overturning the bankruptcy court's decision: (1) the Lease terminated in January of 2008; (2) the parties terminated Debtor's operating rights in June 2008; and (3) the Lease is not assumable under § 365(c)(1). Each of these arguments are addressed below.

### A. Termination in January 2008

COP's first argument is that the Lease is not assumable because it terminated at the close of business on January 8, 2008, despite the filing of the involuntary petition. COP invokes two sections of the Code to support its argument: § 541(b)(2)

and § 365(c)(3). Section 541(b)(2) specifically *excludes* from the bankruptcy estate:

> any interest of the debtor as a lessee under a lease of nonresidential real property that has terminated at the expiration of the stated term of such lease before the commencement of the case under this title, and *ceases to include any interest of the debtor as a lessee under a lease of nonresidential real property that has terminated at the expiration of the stated term of such lease during the case*[.][27]

Section 365(c)(3) provides that a trustee may not assume an unexpired lease of the debtor if "such lease is of nonresidential real property and has been terminated under applicable nonbankruptcy law prior to the order for relief."

Applying these sections, COP argues the Lease "terminated by the expiration of the stated term" of the Lease, namely the Lease's default provision, on January 8, 2008. Although COP acknowledges, as it must, that filing of the involuntary petition invoked the automatic stay, COP points out that, under Tenth Circuit precedent, the stay does not toll the mere running of time under a contract, nor prevent the automatic termination of a contract by its terms. COP contends the January 5 & 6 Letters are evidence that the parties agreed to automatic termination of the Lease at the end of the 60–day cure period on January 8, 2008. Because the automatic stay did not stop this alleged automatic termination of the Lease on the Petition

---

**22.** *EBG Midtown S. Corp. v. McLaren/Hart Envtl. Eng'g Corp. (In re Sanshoe Worldwide Corp.),* 139 B.R. 585, 590 (S.D.N.Y.1992), *aff'd,* 993 F.2d 300 (2d Cir.1993).

**23.** *In re Headquarters Dodge, Inc.,* 13 F.3d 674, 682–83 (3rd Cir.1993).

**24.** *In re Parsons,* 280 F.3d 1185, 1188 (8th Cir.2002).

**25.** *Diviney v. NationsBank of Tex. (In re Diviney),* 225 B.R. 762, 769 (10th Cir. BAP 1998).

**26.** *Williamson v. Kay (In re Villa W. Assocs.),* 146 F.3d 798, 802 (10th Cir.1998).

**27.** 11 U.S.C. § 541(b)(2) (emphasis added).

Date, which was several months prior to entry of the order for relief, COP argues that the Trustee may not assume the Lease under § 365(c)(3).

▇ COP is correct that as a general rule, the automatic stay does not prevent the automatic termination of a contract. What constitutes an automatic termination, however, is not as broad as COP contends. In the case of *In re Trigg*, the Tenth Circuit held that "[a] contract that provides for termination on the default of one party may terminate under ordinary principles of contract law even if the defaulting party has filed a petition[.]"[28] The *Trigg* case involved oil and gas leases that provided for automatic termination if the debtors failed to pay rent. When debtors failed to pay the rent postpetition, the Tenth Circuit concluded that the "debtors' failure to tender the annual rental caused the leases to lapse automatically by their own terms."[29] Similarly, in the oft-cited Seventh Circuit case of *Moody v. Amoco Oil Co.*, certain dealership agreements executed by the debtors were subject to automatic termination ninety days after notice was provided to the debtors. The ninety-day termination notices issued to debtors prepetition gave the debtors no right to cure once the notices were issued. The Seventh Circuit concluded that the debtors had no right to assume or reject the dealership agreements because the automatic stay did not toll the automatic termination of the dealership agreements at the end of the ninety-day period.[30] In both these cases, it is important to note that the contract in question explicitly provided for automatic termination upon default. No action by the non-debtor party was required to terminate the contract, only the passage of time.[31] Further, neither contract provided the debtor an opportunity to cure and none of the debtors had a pending right to cure on their respective petition dates. As noted by the Seventh Circuit, "the termination must be complete and not subject to reversal, either under the terms of the contract or under state law."[32]

These principles have also been applied in determining whether a lease has "terminated at the expiration of the stated term" and thus ceased to be property of the estate under § 541(b)(2). Courts applying this language focus on whether the lease in question has automatically terminated, without further action by the landlord. For example, where the "stated term" which expires is the temporal limit of the lease (*e.g.* a ten year lease expires because the ten year term ends), courts hold that the lease ceases to be property of the estate and the automatic stay does not

---

28. *Trigg v. U.S. Dept. of the Interior (In re Trigg)*, 630 F.2d 1370, 1374 (10th Cir.1980); *see also Moody v. Amoco Oil Co.*, 734 F.2d 1200, 1213 (7th Cir.1984) ("The automatic stay does not toll the mere running of time under a contract, and thus it does not prevent automatic termination of the contract.").

29. *In re Trigg*, 630 F.2d at 1373.

30. *Moody*, 734 F.2d at 1213.

31. *See also In re Liljeberg Enters., Inc.*, 304 F.3d 410, 437 (5th Cir.2002) (citing *Hertzberg v. Loyal Am. Life Ins. Co. (In re B & K Hydraulic Co.)*, 106 B.R. 131, 135–36 (Bankr. E.D.Mich.1989)) ("'[T]he issue must be wheth-er termination requires the non-debtor party to undertake some post-petition affirmative act, such that [when] termination of the contract requires an affirmative act of the non-debtor party, the contract remains executory because such an act is stayed under 11 U.S.C. § 362(a), but, [when] termination occurs without any action by the non-debtor party, the contract is no longer executory and no longer subject to assumption or rejection.'") (emphasis and internal quotation marks omitted).

32. *Moody*, 734 F.2d at 1212.

apply.[33] This makes sense because, under most states' property laws (including Utah), a term-of-years tenancy automatically terminates at the expiration of the specified term without action by the landlord, unless the lease specifies otherwise.[34] Where a lease has terminated automatically at the end of its stated term, § 362(b)(10) permits the lessor to obtain possession of the leased property without violating the automatic stay.

As noted by COP, a limited number of courts have extended the application of § 541(b)(2) to situations in which the landlord has accelerated termination of a lease due to nonpayment of rent.[35] Even in those cases, however, the termination must occur automatically to fall outside of the scope of the automatic stay. This was true in the case relied on by COP, *In re Policy Realty*.[36] In that case, the landlord had sent the tenant a prepetition notice of default for nonpayment of rent and then, several weeks later, a termination notice

which terminated the lease at the end of the following week. It does not appear that the tenant had any cure rights during the termination notice period. Under New York law, the termination notice automatically terminated the lease "when the time expires, rather than on any further act by the landlord." [37] As such, the court concluded that the lease terminated by the expiration of a "stated term" when the notice period expired on the petition date and the lease was not property of the estate and was not protected by the automatic stay.

■ So, like any other contract, a nonresidential lease can, under certain circumstances, automatically terminate postpetition despite the automatic stay. In such cases, the lease ceases to property of the estate. Like with any other contract, however, the termination must occur automatically, without further action by the landlord. If the termination does not occur automatically but instead requires further

**33.** *E.g., In re Premier Auto. Servs., Inc.*, 492 F.3d 274, 281–82 (4th Cir.2007) (property of the estate did not include, and automatic stay did not apply to, debtor's nonresidential property lease, once lease expired two days after commencement of Chapter 11 case); *In re Tut's Pyramid, Inc.*, 178 B.R. 867, 871 (Bankr. M.D.Fla.1995) (holding debtor could not assume lease where lease's 26–month term expired three days after filing of petition date).

**34.** *Coleman v. Thomas*, 4 P.3d 783, 785 (Utah 2000) (quoting *Restatement (Second) of Property* § 1.4 cmts. d & e (1977)).

**35.** *See In re Policy Realty Corp.*, 242 B.R. 121, 128 (S.D.N.Y.1999), *aff'd*, 213 F.3d 626 (2d Cir.2000); *In re Southcoast Express, Inc.*, 337 B.R. 739, 742–43 (Bankr.D.Mass.2006). Not all authorities agree with this contention. *Collier on Bankruptcy* suggests that § 541(b)(2) and § 362(b)(10) should apply *only* in cases where the temporal term of the lease expires postpetition, and not to leases terminated for other reasons, such as a default. 3–362 *Collier on Bankruptcy* ¶ 362.05[10] (Alan N. Resnick & Henry J. Sommer eds., 15th ed. rev.) ("[T]he lessor

remains stayed from seeking to retake the premises even after automatic termination of a lease upon an event of default, if the termination occurs postpetition. Only when the termination is based on expiration of the agreed term of the lease may the stay be disregarded.").

**36.** *In re Policy Realty Corp.*, 242 B.R. at 128. There, the landlord terminated a lease with its tenant for failure to pay rent. A commercial subtenant commenced an action in New York state court for damages and an injunction to prevent the termination of the prime lease. The landlord sought to vacate the injunction in state appellate court and the subtenant filed for bankruptcy just before the temporary restraining order was vacated. The landlord then proceeded in the bankruptcy court, seeking a declaration that its termination actions against the prime tenant were exempt from the automatic stay triggered by the subtenant's bankruptcy case.

**37.** *Id.*

action by the landlord, § 541(b)(2) has been held inapplicable.[38] In such a case, the exception found at § 362(b)(10) would not apply and the automatic stay would bar any action by the landlord to terminate the lease.[39]

■ COP contends that an automatic termination of the Lease occurred in this case. COP points to the default provision of the Lease, as well as its January 5 & 6 Letters as evidence that the Lease automatically terminated at the close of business on January 8 without any further action by COP. As to the default provision of the Lease, we agree with the bankruptcy court that the Lease does not provide for automatic termination. Rather, upon a default, COP must give Debtor written notice identifying the default and specifying with reasonable particularity the nature and extent thereof. If Debtor does not cure the default within 60 days after the notice is served, then "this [Lease] *may* be terminated and all of the rights of the [Debtor] shall cease and be wholly determined and COP *may* at once take possession of any or all of the properties herein described."[40] The conditional language of "may be terminated" and "may at once take possession" gives COP the option for termination. It does not provide for automatic termination of the Lease upon default or upon expiration of the cure period, since COP could still conceivably decide not to terminate the Lease.[41]

■ The January 5 & 6 Letters, though technically not a term of the Lease, do appear to contemplate an automatic termination of the Lease at the end of the cure period. In addition, the January 5 & 6 Letters appear to comport with Utah state law requirements for termination of a lease.[42] Under Utah law, where a lease requires the lessor to provide the tenant with notice of default and an option to cure prior to termination of the lease, the notice must "plainly indicate the nature of the default or breach and give reasonable notice that failure to cure the default within the time allowed may lead to termination."[43] The notice of termination must comply with all applicable provisions of the lease.[44] It must also be clear and unequiv-

---

**38.** *See In re PAVCO Enters., Inc.,* 172 B.R. 114, 117–18 (Bankr.M.D.Fla.1994) (lease was property of estate because notice of default sent by landlord did not unequivocally state that lease would terminate, and thus did not effect an automatic termination).

**39.** *See Vidal v. Alvarado,* 377 B.R. 788, 794 (D.P.R.2007) (Automatic stay protected debtors' interest under nonresidential real property lease where landlord first wrote letters purporting to terminate debtors' lease postpetition); *In re Mad LO LO LLC,* No. 09–11911, 2009 WL 2902567 at *4 (Bankr.S.D.N.Y. May 28, 2009) (concluding that § 362(b)(10) did not apply because the debtor's lease did not expire on its stated terms).

**40.** *Coal Operating Agreement* at ¶ 9, *in* Appellant Appx. Vol. 2 at 375 (emphasis added).

**41.** COP argues that the default provision of the Lease is ambiguous because it states that the Lease "may be terminated" but also states that the rights of Debtor "shall cease." A lease agreement, like any contract, "is ambiguous if it is capable of more than one reasonable interpretation because of uncertain meanings of terms, missing terms, or other facial deficiencies." *Winegar v. Froerer Corp.,* 813 P.2d 104, 108 (Utah 1991) (internal quotation marks omitted). When read as a whole, we see no ambiguity in the default provision.

**42.** Bankruptcy courts generally look to state law to determine whether and when a lease terminates. *In re Williams,* 144 F.3d 544, 546–47 (7th Cir.1998).

**43.** *Bentley v. Potter,* 694 P.2d 617, 620 (Utah 1984).

**44.** *Id.* (notice of termination did not effect termination of lease where notice failed to refer to any breach by the lessee or to give the

ocal that termination will occur.[45] If the notice complies with these requirements, it can effect a termination of the lease.[46] Here, the January 5 & 6 Letters set forth the nature of Debtor's default, its cure rights, and unequivocally states that failure to cure will result in termination of the Lease at the close of business on January 8, 2008.

Even assuming the January 5 & 6 Letters comply with Utah law, however, we agree with the bankruptcy court that the; filing of the involuntary petition prevented termination of the Lease. What COP's argument fails to account for is that Debtor had something on the Petition Date that the debtors in the cases discussed above did not have—cure rights. The presence of a right to cure changes the "automatic termination" analysis. For example, in *Moody*, the Seventh Circuit also addressed the assumability of a second type of contract—a jobbership agreement.[47] The debtors were also in default of this agreement and had received a termination no-tice that gave a fifteen-day cure period. The debtors filed for bankruptcy prior to expiration of the cure period. The Seventh Circuit concluded that debtors could assume the jobbership contract despite issuance of the termination notice because "[a]t the time debtors filed their petition, the time for cure had not expired. The contract was still executory."[48] The Seventh Circuit went on to hold that the time for debtors to cure and assume the jobbership agreement was governed by § 365. That section permits debtors "a certain amount of flexibility in determining whether to assume or to reject a contract."[49] Although not addressed in the opinion, it is implicit in the Court's ruling that the parties' contractual fifteen-day cure period did not continue to run postpetition so as to limit the debtors' cure rights.

Other courts have also distinguished situations in which the contract at issue provides the right to cure and those which do not.[50] Although the reasoning of these

required time to cure); *see also* 16 Milton R. Friedman & Patrick A. Randolph, Jr., *Friedman on Leases* § 16:2.2, *16–18 (2008) ("Any such notice must announce an election to terminate and comply with any forfeiture provision relied on.").

**45.** *See Bentley*, 694 P.2d at 620 (finding that notice provided to tenant "did not plainly indicate that the lease might be terminated for nonperformance"); *Friedman on Leases* § 16:2.2, *16–18 ("A notice of landlord's election to terminate a lease by reason of tenant's default must manifest a clear intention to terminate. Giving notice of tenant's breach, together with a statement of landlord's right to terminate, is no exercise of a right to terminate.").

**46.** *See Hackford v. Snow*, 657 P.2d 1271, 1275 (Utah 1982) ("Generally, a lease may be unilaterally terminated prior to the expiration of its term by exercise of an option to terminate."); *Lincoln Fin. Corp. v. Ferrier*, 567 P.2d 1102, 1104–05 (Utah 1977) (where lease provided that either party could terminate by giving the other fifteen days written notice and lessor timely served notice of termination, lease terminated at end of notice period); *Russell v. Park City Utah Corp.*, 29 Utah 2d 184, 506 P.2d 1274, 1276 (1973) (where default notice did not give full cure period required by lease terms, notice did not terminate lease).

**47.** *Moody v. Amoco Oil Co.*, 734 F.2d 1200, 1215–16 (7th Cir.1984).

**48.** *Id.* at 1216.

**49.** *Id.*

**50.** *E.g., In re Tudor Motor Lodge Assocs.*, 102 B.R. 936, 950–51 (Bankr.D.N.J.1989) (where a franchisee is granted time to cure defaults and the franchisee files petition prior to the time the cure period expires, the franchise agreement is not terminated and is part of the estate); *In re Borbidge*, 66 B.R. 998, 1002–03 (Bankr.E.D.Pa.1986) (lease assumable because right to cure had not yet expired when the involuntary bankruptcy was filed); *In re*

cases is not always explicit, courts appear to focus on a debtor's existing contractual right to cure and revive the contract, thus making termination incomplete and giving the debtor a sufficient interest in the contract to assume.[51] It follows that if there is an assumable lease under § 365 which is property of the estate, it is subject to the automatic stay provisions of § 362(a).

Once a petition is filed, a debtor's cure rights are controlled by § 365. "Section 365, in conjunction with the automatic stay provision of section 362, accordingly suspends, once the bankruptcy petition is filed, the termination of a lease that is in default; it extends a debtor lessee's opportunity to cure any defaults until the debtor has the chance to decide whether to assume the lease."[52] The right to cure and assume is independent of any state law or contractual provision.[53] Although a debtor's cure rights under § 365 may seem to interfere with the parties' contractual rights, "[t]he purpose behind § 365 is to balance the state law contract right of the creditor to receive the benefit of his bargain with the federal law equitable right of the debtor to have an opportunity to reorganize."[54] To hold otherwise would deny the debtor "the benefit of section 365's 'suspension of time' in order to determine whether to assume or reject the lease."[55]

Applying these principles in this case, we agree with the bankruptcy court that Debtor had an existing contractual right to cure the Lease at the time the involuntary petition was filed. Termination of the Lease was not complete and it was subject to reversal. As such, Debtor's retained interest in the Lease became property of the estate, including the right to cure the default. After filing of the petition, Debtor's cure rights, including the deadline for curing defaults, were controlled by § 365 and not the January 5 & 6 Letters. Debtor's interest in the Lease came under the protection of the automatic stay. Thus, even considering the January 5 and January 6 Letters relied on by COP, we conclude that the Lease did not automatically terminate on January 8.[56]

---

*Masterworks, Inc.*, 100 B.R. 149, 151 (Bankr. D.Conn.1989) (franchise agreement still executory because debtor's right to cure had not elapsed on petition date); *see also In re Pyramid Operating Auth., Inc.*, 144 B.R. 795, 811–12 (Bankr.W.D.Tenn.1992) ("courts have distinguished cases in which the agreements themselves do not provide the right to cure upon tendering of notice and those which do .... [w]nat remains dispositive is whether the debtor's right to cure had lapsed prepetition and had thereby become nonexecutory.") (citations omitted).

**51.** *See In re Round Hill Travel Inc.*, 52 B.R. 807, 809–10 (Bankr.D.Nev.1985) (debtor's pending right to cure defaults under operating agreement gave debtor sufficient interest in agreement to assume it under 6 365); *In re Borbidge*, 66 B.R. at 1003 (lease assumable because right to cure had not Vet expired when the involuntary bankruptcy was filed); *Moody*, 734 F.2d at 1212 ("[T]he termination must be complete and not subject to reversal, either under the terms of the contract or under state law.").

**52.** *In re Circle K Corp.*, 127 F.3d 904, 909 (9th Cir.1997) (footnote omitted).

**53.** *In re Sigel & Co.*, 923 F.2d 142, 144–45 (9th Cir.1991); 2 Hon. William L. Norton Jr. & William L. Norton III, *Norton Bankr.Law & Practice* § 46:29 (3rd ed.2009).

**54.** *In re Circle K Corp.*, 127 F.3d at 909 (citing *In re Circle K Corp.*, 190 B.R. 370, 376 (9th Cir. BAP 1996)).

**55.** *Id.* at 909–10.

**56.** COP also argues the bankruptcy court erred in concluding that the January 5 & 6 Letters had no effect because they violated the USDC's Supplemental Order. Because we affirm the bankruptcy court's conclusion that no termination occurred, even considering the January 5 & 6 Letters, we decline to address this issue.

## B. Termination in June 2008

■ COP next argues that the Lease terminated in June 2008, when Debtor purportedly executed a "voluntary unconditional termination" of all of its leases and operating agreements with COP so that Hiawatha could execute its own lease with COP. COP claims Debtor terminated the Lease in a letter to COP dated June 23, 2008.[57] COP argues this letter was a valid exercise of Debtor's § 303(f) powers during the gap period.

The bankruptcy court held that the June 23 letter did not terminate the Lease because "the Court questions the timing and efficacy of the Debtor's purported voluntary relinquishment based on the evidence presented at the hearings."[58] The court cited to evidence that neither Debtor's attorney nor COP's attorney were notified of the decision to relinquish the Lease before July 8, 2008 (which is one day after Aquila filed its Motion to Preserve Assets). Debtor's attorney also testified that he had no recollection of attending a meeting where the voluntary relinquishment was discussed, as claimed by Debtor's president. The bankruptcy court also questioned other circumstances surrounding Debtor's purported sale to Hiawatha, finding that the details of execution were "sketchy at best" and that Debtor failed to

conduct an arm's length transaction in selling its assets to Hiawatha.[59]

The bankruptcy court's finding that Debtor did not actually terminate the Lease by sending a letter to COP on June 23 is a question of fact, subject to review under the clearly erroneous standard.[60] The issue of a debtor's credibility is also a question of fact.[61] When factual findings are based on determinations regarding credibility of witnesses, even greater deference is given to the bankruptcy court's findings.[62] We see no clear error in the bankruptcy court's findings. The court conducted four days of evidentiary hearings and was able to make credibility determinations based on live testimony of the representatives of Debtor, COP and Hiawatha. Moreover, COP does not directly challenge the bankruptcy court's findings concerning the "timing and efficacy of the Debtor's purported voluntary relinquishment." Because the bankruptcy court correctly deemed the June 23 letter ineffective, there was no termination of the Lease in July 2008.[63]

## C. Assumability under § 365(c)(1)

■ COP argues § 365(c)(1) bars the Trustee from assuming the Lease because applicable law excuses COP from accepting performance from an assignee. Sec-

---

**57.** *See Letter dated June 28, 2008, in* Appellant Appx. Vol. 2 at 581–82.

**58.** *In re C.W. Mining Co.*, No. 08–20105, 2009 WL 1118717, at *12 (Bankr.D.Utah April 23, 2009).

**59.** *Id.* at *4.

**60.** *See Moody v. Amoco Oil Co.*, 734 F.2d 1200, 1214 (7th Cir.1984) (finding that issue of whether lessor agreed to standstill of lease default cure period question of fact); *cf. In re Durability Inc.*, 212 F.3d 551, 557–58 (10th Cir.2000) (issues of fact as to whether contract terminated prepetition precluded summary judgment).

**61.** *In re Sharp*, 361 B.R. 559, 564–65 (10th Cir. BAP 2007).

**62.** *Dalton v. Internal Revenue Serv.*, 77 F.3d 1297, 1302 (10th Cir.1996).

**63.** COP also challenges the bankruptcy court's alternate conclusion that the Lease did not terminate in June 2008 because § 362 barred any action by COP to accept the Debtor's alleged voluntary relinquishment or to exercise dominion or control over the Lease, because we affirm the bankruptcy court's finding on the efficacy of the June 23 letter, we do not reach this issue.

tion 365(c)(1) is an exception to the general rule of assignability of a debtor's contracts and leases, and was intended by Congress to be applied narrowly.[64] It provides that:

> The trustee may not assume or assign any executory contract or unexpired lease of the debtor, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties, if—
>
> > (1)(A) applicable law excuses a party, other than the debtor, to such contract or lease from accepting performance from or rendering performance to an entity other than the debtor or the debtor in possession, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties; and
> >
> > (B) such party does not consent to such assumption or assignment[.]

Section 365(c)(1) is directed to unexpired contracts and leases that, regardless of their provisions, would not be assignable under applicable law. Hence, § 365(c)(1) requires a court to look to the "applicable law" and determine whether a particular contract or lease is unassignable. The phrase "applicable law" generally refers to applicable non-bankruptcy law.[65]

▮▮▮ The goal of § 365(c)(1) is to "protect non-debtor third parties whose rights may be prejudiced by having a contract performed by an entity other than the one with which it originally contracted, but the exception is limited to cases where non-bankruptcy law so states."[66] As such, for § 365(c)(1) to apply, the applicable law "must specifically state that the contracting party is excused from accepting performance from a third party under circumstances where it is clear from the statute that the identity of the contracting party is crucial to the contract or public safety is at issue."[67] The determination of whether a particular contract fits within § 365(c)(1) will generally depend on the "sui generis attributes of the performance."[68]

▮▮▮ In this case, COP contends that the "applicable law" is the 1943 case of *Powerine Co. v. Russell's, Inc.*[69] In that case, the Utah Supreme Court found that a gasoline service station lease was a personal services contract, based in part on certain "special circumstances." In its decision, the court first noted that "[i]t is an almost universal rule that a lease of real property is assignable, unless some special circumstances are present."[70] Those special circumstances include:

> [W]hen there is a special reliance on the skill or knowledge of the lessee, or when there is contemplated a close association between the lessee and the lessor in the operation of the leased premises, an association requiring a trust in the lessee on the part of the lessor, the courts will hold that the lease is a personal contract and not assignable, and the lessee has

**64.** *In re Grove Rich Realty Corp.,* 200 B.R. 502, 506 (Bankr.E.D.N.Y.1996).

**65.** *In re Commonwealth Mortgage Co.,* 149 B.R. 4, 7 (Bankr.D.Mass.1992).

**66.** *In re Grove Rich Realty Corp.,* 200 B.R. at 507.

**67.** *In re ANC Rental Corp.,* 277 B.R. 226 (Bankr.D.Del.2002), *aff'd,* 57 Fed.Appx. 912 (3rd Cir.2003).

**68.** *In re Health Plan of the Redwoods,* 286 B.R. 407, 409 (Bankr.N.D.Cal.2002).

**69.** *Powerine Co. v. Russell's, Inc.,* 103 Utah 441, 135 P.2d 906 (1943).

**70.** *Id.* at 913.

no right to sublease.[71]

The Utah Supreme Court concluded these circumstances existed in the *Powerine* case because the parties executed the lease on a written form and struck out all provisions regarding the assignment of the lease and subleasing, thus indicating "the intention of the parties was to restrict the lease to a personal undertaking—just between the lessor and the lessee."[72] In addition, the lease provided for rent on the basis of one-cent per gallon on all gasoline sold, thus giving the lessor a "vital interest in seeing that an individual or company experienced in the business was in possession of the premises and operating a station there."[73]

The bankruptcy court held that the circumstances of *Powerine* case were distinguishable from Debtor's Lease with COP. The court noted that unlike the lease in *Powerine*, the Debtor's Lease clearly provides for the assignment of the rights and obligations under the Lease. Further, the court found COP's proffered evidence (primarily the testimony of Joe Kingston) that the parties intended the Lease to be a personal service contract to be unpersuasive and self-serving. Although Joe Kingston claimed to place special confidence in Debtor's current president and various other individuals who conducted and now conduct coal mining at the Bear Canyon Mine, the court pointed out that the Lease was signed in 1997 when a different president ran Debtor. The court concluded

that "COP has not demonstrated persons or duties named under the [Lease] that are so personal in nature that the characteristics or personality of the coal mine operator could be deemed a dominant factor in the reasons for entering into the [Lease]."

We see no clear error in the bankruptcy court's factual findings.[74] Section 10 of the Lease, entitled "HEIRS AND SUCCESSORS" provides that "Each obligation hereunder shall extend to, and be binding upon, and every benefit hereof shall inure to, the heirs, executors, administrators, successors, or assigns of the respective parties hereto."[75] Although COP argues this provision is ambiguous, we agree with the bankruptcy court that the provision contemplates assignment of the Lease. There is no indication in the Lease that it is unassignable. That the Lease contemplates assignment makes Debtor's case distinguishable from *Powerine*.

COP also claims the bankruptcy court applied the wrong test, and that *Powerine* calls for a subjective analysis of whether the parties contemplated a close association between Debtor and COP. The *Powerine* case, however, applies a fairly standard analysis for determining whether a lease amounts to a personal service contract—assessing whether the lessor placed a special reliance on the skill or knowledge of the lessee, or whether there was a close association between the parties that required a special trust.[76] The bankruptcy

**71.** *Id.*

**72.** *Id.* at 914.

**73.** *Id.*

**74.** *See In re Health Plan of Redwoods,* 286 B.R. at 409 ("Whether or not a contract is a personal services contract is a question of fact to be made under state law after all facts and circumstances are considered.").

**75.** *Lease* at ¶ 10, *in* Appellant Appx. Vol. 2 at 375.

**76.** *E.g., In re Health Plan of Redwoods,* 286 B.R. at 409 ("In order to be considered a personal service contract, there must be a special relationship between the parties or the party to perform must possess special knowledge or a unique skill, such that no performance save that of the contracting party could be *(sic)* meet the obligations of the contract."); *Restatement (Second) of Property:*

court considered these factors, and was not persuaded by COP's evidence. "Where there are two permissible views of the evidence, a finding adopting one of those views cannot be clearly erroneous." [77] That the court did not adopt COP's view of the evidence is not a basis for overturning the order.

## IV. Conclusion

For the reasons stated herein, the Memorandum Decision of the bankruptcy court denying COP's Motion to Require the Trustee to Assume or Reject Lease and granting Trustee's Motion to Extend Time for Trustee to Assume or Reject Executory Contracts or Unexpired Leases of the Debtor is AFFIRMED.

*Landlord and Tenant* § 15.1 cmt. c (1977) ("If the landlord's expectations under the lease as to personal services of the tenant may be fulfilled only by a person with the special qualifications of the tenant, and the special qualifications were a primary motivation for the landlord to enter into the lease with that particular tenant, the landlord is entitled to have the person of his choice continue as the tenant.").

**77.** *Ryan v. Am. Natural Energy Corp.*, 557 F.3d 1152, 1157 (10th Cir.2009).