In re FIRST PROTECTION,
INC., Debtor.

David Fursman; Laura Fursman; Gale
P. Thompson; Redux Development,
LLC, Appellants,

v.

Dale D. Ulrich, Chapter
7 Trustee, Appellee.

BAP No. AZ–10–1104–JuBaPa.
Bankruptcy No. 08–08964–RTB.
Adversary No. 09–01266–RTB.

United States Bankruptcy Appellate Panel
of the Ninth Circuit.

Argued and Submitted Oct. 22, 2010.

Filed Nov. 22, 2010.

David Fursman, Scottsdale, AZ, pro se.

Stuart Bradley Rodgers, Lane & Nach, P.C., Phoenix, AZ, for Appellee Dale D. Ulrich.

Before: JURY, BAUER,[1] and PAPPAS, Bankruptcy Judges.

## OPINION

JURY, Bankruptcy Judge:

Chapter 7[2] trustee, Dale D. Ulrich, commenced an adversary proceeding against debtors David and Laura Fursman (the "Fursmans" or "Debtors") and First Protection, Inc. ("FP"), and non-debtors Gale P. Thompson ("Thompson") and Redux Development, LLC ("Redux") (collectively, the "Defendants") seeking to avoid the Fursmans' postpetition transfer of 50% of their interest in Redux to Thompson under § 549. The parties filed cross motions for summary judgment. Finding no genuine issue as to any material fact, the bankruptcy court granted the trustee's motion and entered judgment avoiding the transfer.

Defendants[3] appeal, assigning multiple errors to the bankruptcy court's decision. For the reasons explained below, we AFFIRM.

## I. FACTS

The Fursmans were the sole owners of FP, an Arizona corporation, which was in the business of offering remote monitored security systems. They also were the sole owners and members of Redux, which was in the business of acquiring residential properties to renovate and then sell or rent.

On July 18, 2008, the Fursmans filed their individual chapter 11 petition. On the same day, the Fursmans authorized and filed FP's chapter 11 petition. The Fursmans managed their own affairs and those of FP as debtors-in-possession. On September 16, 2008, the bankruptcy court approved the Fursmans' motion to jointly administer the two estates under the caption of FP.[4]

In the Fursmans' individual chapter 11, they listed their 100% membership interest in Redux valued at $340,000 in Schedule B. At the time of their filing, Redux's assets consisted of unencumbered real property and a 2002 Cadillac Escalade. The Fursmans also listed the operating agreement between Redux and themselves as an executory contract in Schedule G.

On January 19, 2009, the Fursmans transferred 50% of their membership interest in Redux to Thompson, who was Laura Fursman's mother. In exchange, Thompson made a capital contribution of $1,000 and agreed to provide loans or a line of credit to Redux as agreed upon by the members. Subsequently, Thompson made approximately $70,000 in loans to Redux so that the company could complete its sole residential project.[5] The Furs-

1. Hon. Catherine E. Bauer, Bankruptcy Judge for the Central District of California, sitting by designation.

2. Unless otherwise indicated, all chapter, section and rule references are to the Bankruptcy Code, 11 U.S.C. §§ 101–1532, and to the Federal Rules of Bankruptcy Procedure, Rules 1001–9037.

3. Redux did not participate in this appeal because it was unable to afford counsel.

4. Neither FP's estate nor its assets are implicated in this appeal.

5. The trustee later learned that the bulk of Thompson's loans were used for the Fursmans' personal use, with less than $5,000 spent on improving the real property owned by Redux. Debtors contend that they had an "agreement" with Redux to pay their living expenses.

mans assert that Thompson's loans were secured by the underlying real property owned by Redux but the record has no evidence of a perfected security interest.[6]

On June 15, 2009, the Fursmans' and FP's chapter 11 cases converted to chapter 7 and Ulrich was appointed the chapter 7 trustee. The Fursmans amended their Schedule B to reflect their interest in Redux valued at $70,000.

On October 1, 2009, the trustee commenced an adversary proceeding against the Defendants seeking to avoid the Fursmans' postpetition transfer of 50% of their interest in Redux to Thompson under § 549 and requested an order requiring turnover of Redux's books and records under § 542.[7] On the same day, the trustee moved for a temporary restraining order, seeking to enjoin the Fursmans from selling or otherwise dissipating assets owned by Redux, which the bankruptcy court granted by order entered on October 2, 2009. The court subsequently granted the trustee's request for a preliminary injunction by order entered on October 15, 2009.

Thereafter, the parties filed cross motions for summary judgment on the merits of the complaint. After hearing oral argument, the court took the matter under advisement. On March 5, 2010, the bankruptcy court ruled for the trustee and entered judgment on March 15, 2010.

The bankruptcy court found that the Fursmans' interest in Redux became property of their bankruptcy estate and therefore they had no personal interest in Redux at the time they authorized the transfer to Thompson. The court also found that the transfer was avoidable under § 549 because it was an unauthorized postpetition transfer. The court lifted the injunction, finding that it was inapplicable to the trustee and the estate as 100% owner of Redux. Finally, the court awarded the trustee $250 in costs, payable by Defendants, jointly and severally.

On March 17, 2010, the Fursmans filed a Motion for Reconsideration, arguing that the bankruptcy court's factual finding that the transfer occurred after they filed their chapter 7 bankruptcy petition was clearly erroneous. They maintained that the transfer occurred six months prior to the conversion of their case and that at the time of the transfer they were acting as debtors-in-possession. The court denied the Fursmans' motion by order entered on March 31, 2010, finding that the trustee's avoiding power under § 549 was not affected by the conversion of their case.

On March 29, 2010, the Defendants filed a timely Notice of Appeal ("NOA"), which was not signed by Thompson. They subsequently moved for a stay pending appeal which the bankruptcy court denied.

## II. JURISDICTION

The bankruptcy court had jurisdiction under 28 U.S.C. § 1334 over this core proceeding under § 157(b)(2)(A) and (E). We have jurisdiction under 28 U.S.C. § 158(a).

## III. ISSUES

A. Whether the Fursmans have standing to appeal the bankruptcy court's judgment;

B. Whether the NOA and appellate briefs filed and signed by the Fursmans on behalf of all Defendants was effective as to Thompson; and

---

**6.** At oral argument, trustee's counsel acknowledged that obligations of Redux, whether to Thompson or to other creditors, would need to be addressed by the trustee either in the course of dissolving the LLC or as claims against the estate.

**7.** The § 542 claim for relief is not at issue in this appeal.

C. Whether the bankruptcy court erred in granting the trustee's motion for summary judgment.

## IV. STANDARDS OF REVIEW

■ We review questions of law that involve jurisdiction and standing de novo. *United States v. Garrett*, 253 F.3d 443, 446 (9th Cir.2001); *Menk v. LaPaglia (In re Menk)*, 241 B.R. 896, 903 (9th Cir. BAP 1999).

■ We review de novo the bankruptcy court's grant of summary judgment, viewing the evidence in the light most favorable to the nonmoving party to determine whether any genuine issue of material fact exists and whether the bankruptcy court correctly applied the relevant substantive law. *Christensen v. Yolo Cnty. Bd. of Supervisors*, 995 F.2d 161, 163 (9th Cir. 1993).

■ We also review de novo whether property is property of the estate. *Cisneros v. Kim (In re Kim)*, 257 B.R. 680, 684 (9th Cir. BAP 2000).

## V. DISCUSSION

### A. Preliminary Issues

■ Before addressing the merits, the trustee presents threshold issues concerning the propriety of this appeal.

The trustee maintains that the Fursmans lack standing to appeal the judgment avoiding the transfer because Thompson, as the transferee, is the "person aggrieved." *See Debbie Reynolds Hotel & Casino, Inc. v. Calstar Corp. (In re Debbie Reynolds Hotel & Casino, Inc.)*, 255 F.3d 1061, 1066 (9th Cir.2001) ("Only a party who is 'directly and adversely affected pecuniarily' by an order of the bankruptcy court may appeal."). We have previously held that debtors, as transferors of property, do not have standing to appeal an order avoiding the transfer. *See Trujillo v. Grimmett (In re Trujillo)*, 215 B.R. 200, 203 n. 3 (9th Cir. BAP 1997). However, we do not apply this rule in a vacuum. In *Trujillo*, the debtors argued on appeal that the property was never transferred at all because they retained beneficial title to the property. *Id.* The Panel held that the debtors had standing to appeal this limited issue. *Id.*

Similarly, the Fursmans raise numerous issues relating to their defenses as transferors. They argue: (1) that they (personally) did not sell or otherwise transfer their membership interest in Redux to Thompson; (2) that the transfer was authorized because they were operating as debtors-in-possession when the transfer occurred; (3) that the trustee had no right to control Redux or participate in management because he was simply an assignee of the Fursmans' rights under Arizona law and the operating agreement; and (4) that the operating agreement was an executory contract which the trustee did not timely assume under § 365(d)(1) and which was not assumable under § 365(c)(1)(A) or (e)(2)(A)(i). We conclude that resolution of these issues directly affects the Fursmans and thus they have standing to address these issues on appeal.

Moreover, it is unnecessary to adhere to strict standards regarding standing on appeal here because the trustee named the Fursmans as party defendants in the adversary proceeding. The adverse judgment against them not only avoids the transfer to Thompson, but also makes the Fursmans liable for the costs awarded to the trustee. Therefore, the Fursmans do not stand solely in the shoes of a debtor in this appeal, but will suffer pecuniary harm as defendants if the judgment is affirmed. Under these circumstances, the Fursmans should not be denied an opportunity to appeal from an adverse judgment when they fully participated in defending the case below. *See Comjean v. Cruickshank,*

191 B.R. 504, 507 (D.Mass.1995) (noting that imposing the pecuniary loss requirement on a debtor who was named as a party defendant in an adversary proceeding "would paradoxically imply that a party against whom a judgment is entered is not aggrieved by that judgment.").

 However, the Fursmans may only appeal to protect their own interests and not those of a coparty. *Taxel v. Elec. Sports Research (In re Cinematronics, Inc.),* 916 F.2d 1444, 1448 (9th Cir.1990). In this regard, the trustee urges us to dismiss Thompson from this appeal because she did not properly join the NOA or the appellate briefs by signing her name—a requirement under Rule 9011(a). The trustee cites no authority that supports application of Rule 9011(a) to our appeals and the authority we found suggests otherwise.[8] *See Franchise Tax Bd. v. Roberts (In re Roberts),* 175 B.R. 339, 345 n. 4 (9th Cir. BAP 1994) (noting that Fed. R.App. P. 38 rather than Rule 9011 applied for purposes of awarding sanctions for a frivolous appeal). Regardless, whether the rule is applicable or not, the signing of papers, deriving from Rule 9011(a), is a non-jurisdictional requirement. *Becker v. Montgomery,* 532 U.S. 757, 760, 121 S.Ct. 1801, 149 L.Ed.2d 983 (2001). Accordingly, the fact that Thompson signed neither the NOA nor the appellate briefs does not deprive us of jurisdiction over her appeal. *See id.*

Further, Rule 9011(a) provides a remedy for an unsigned paper: "An unsigned paper shall be stricken unless omission of the signature is corrected promptly after being called to the attention of the attorney or party." Here, prompted by the trustee's challenge to Thompson's joinder in this appeal, Thompson filed a declaration on May 29, 2010, stating that it was her "intention and understanding that [she] was actively participating in the proceedings by listing her name in each pleading," as well as her "endorse[ment] of all previous pleadings and documents presented on behalf of [herself] and David and Laura Fursman, including the opening brief filed in the Bankruptcy Appellate Case captioned above." Thompson filed her declaration just fifteen days after the defect was brought to her attention. Thus, even were the papers in this appeal subject to Rule 9011(a), the lack of a signature defect has been cured. *Becker,* 532 U.S. at 760, 121 S.Ct. 1801 ("[I]f the [NOA] is timely filed and adequate in other respects, jurisdiction will vest in the court of appeals, where the case may proceed so long as the appellant promptly supplies the signature once the omission is called to his attention.").

It is undisputed that the NOA was timely filed and adequate in all other respects. Further, it was clear from the face of the NOA that Thompson intended to appeal the bankruptcy court's decision avoiding the transfer; the trustee does not contend otherwise. Accordingly, we decline to dismiss Thompson from this appeal on the technical grounds argued by the trustee.

## B. The Merits

 Section 549 authorizes the trustee to avoid a transfer of estate property that occurs after the commencement of the case. The trustee's prima facie case requires proof of (1) a transfer (2) of estate property; (3) that occurred after the com-

---

**8.** Rule 8001(a) governs the filing of a NOA from a judgment of a bankruptcy court. There is no requirement in Rule 8001 that all the parties sign the NOA. Rule 8001(a) is "modeled after" Fed. R.App. P. 3, which governs the manner of taking an appeal from a district court ruling. *Wien Air Alaska, Inc. v. Bachner,* 865 F.2d 1106, 1111 n. 4 (9th Cir. 1989) (stating that Rule 8001(a) "derives from the appellate rule"). Fed. R.App. P. 3 also does not contain a requirement that all parties sign the NOA.

mencement of the case; and (4) that was not authorized by statute or the court.[9] § 549. Once the trustee establishes a prima facie case, to the extent that a transfer is avoided under § 549, the trustee may recover, for the benefit of the estate, the property transferred, or the value of such property, from the initial transferee or any subsequent transferee. § 550(a)(1) and (2).[10]

■ Rule 6001 provides: "Any entity asserting the validity of a transfer under § 549 of the Code shall have the burden of proof." Therefore, the ultimate burden here is on appellants.

### 1. Transfer

■ Debtors assert that they did not make a "transfer" to Thompson because Redux itself expanded the members to include Thompson. A transfer is broadly defined as:

> [E]ach mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with—(i) property; or (ii) an interest in property.

§ 101(54)(D); *see also, Aalfs v. Wirum (In re Straightline Invs., Inc.),* 525 F.3d 870, 877 (9th Cir.2008). The plain language of the statute makes clear that the transfer need not be made directly by the debtor. § 101(54)(D) (stating that a transfer may be direct or indirect); *see also, Carmel v. River Bank Am. (In re FBN Food Servs., Inc.),* 175 B.R. 671, 683 (Bankr.N.D.Ill. 1994), *aff'd,* 185 B.R. 265 (N.D.Ill.1995). There is no question that a "transfer" of Debtors' property occurred by the transac-

tion between the Fursmans and Thompson even though the transfer may have been effected by Redux, an entity which was 100% owned and controlled by Debtors.

### 2. Estate Property

Moreover, it is clear under § 541(a) that if Debtors possessed any "legal or equitable interest" in Redux as of their filing date, then that interest was property of their estate, and any act by Debtors to exercise control over or to negate such interest might be voidable under § 549(a).

■ Debtors' main contention in this appeal centers on the bankruptcy court's legal conclusion regarding the extent of their interests in Redux that became property of their estate. "Although the question whether an interest claimed by the debtor is 'property of the estate' is a federal question to be decided by federal law, bankruptcy courts must look to state law to determine whether and to what extent the debtor has any legal or equitable interests in property as of the commencement of the case." *McCarthy, Johnson & Miller v. N. Bay Plumbing, Inc. (In re Pettit),* 217 F.3d 1072, 1078 (9th Cir.2000) (citing *Butner v. United States,* 440 U.S. 48, 54–55, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979)).

Because Redux is an Arizona limited liability company, we examine the relevant statutes in the Arizona LLC Act. Ariz. Rev.Stat. § 29–601(13) defines a "Member's interest" as "a member's share of the profits and losses of a limited liability company and the right to receive distributions

---

**9.** Section 549 provides in relevant part: "(a) Except as provided in subsection (b) or (c) of this section, the trustee may avoid a transfer of property of the estate—(1) that occurs after the commencement of the case; ... (2)(A) ...; or (B) that is not authorized under this title or by the court."

**10.** Section 550 provides in relevant part: "(a) Except as otherwise provided in this section,

to the extent that a transfer is avoided under section ... 549 ... of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from—(1) the initial transferee of such transfer ...; or (2) any immediate or mediate transferee of such initial transferee."

of limited liability company assets." Ariz. Rev.Stat. § 29–732(A) provides that an interest in a limited liability company is personal property. Debtors do not dispute that their membership interest and, therefore, their right to profits and distributions from Redux became property of their estate.

Debtors contend, however, that their non-economic rights, such as their right to manage and control Redux, did not become property of their estate. In support of this proposition, they argue that the trustee's rights are only as an assignee under Ariz.Rev.Stat. § 29–732(A) [11] or not unlike that of a judgment creditor with a charging order under Ariz.Rev.Stat. § 29–655(A).[12] As such, they contend the trustee had no right to participate in the management of Redux or to control it, but may recover only the profits and accrued distributions, of which there are none.

Debtors' arguments are similar to those raised in *In re Albright*, 291 B.R. 538 (Bankr.D.Colo.2003), one of the few cases which discuss a bankruptcy trustee's rights in a single-member LLC in conjunction with the governing statutory LLC law. In *Albright*, the chapter 7 trustee moved for authority to liquidate property owned by the individual debtor's LLC. The trustee maintained that because the debtor was the sole member and manager of the LLC at the time she filed bankruptcy, he controlled the LLC and could cause the LLC to sell the real property and distribute the sales proceeds to her bankruptcy estate. *Id.* at 539. The debtor asserted that, at best, the trustee was entitled to a charging order and could not assume management of the LLC or cause the LLC to sell the real property. *Id.* After examining the relevant statutes in the Colorado LLC Act, the court held that the debtor's bankruptcy filing effectively assigned her entire membership interest in the LLC to the bankruptcy estate, and the trustee obtained all her rights, including the right to control the management of the LLC. *Id.* at 540.[13]

In addressing the debtor's argument regarding the statutory charging order limitation, the *Albright* court observed that the purpose of the charging order was not served in single-member LLCs because it was to protect *other* members of an LLC

---

**11.** Ariz.Rev.Stat. § 29–732(A) provides in relevant part:

> The assignment of an interest in a limited liability company does not dissolve the limited liability company *or entitle the assignee to participate in the management of the business and affairs of the limited liability company or to become or to exercise the rights of a member,* unless the assignee is admitted as a member as provided in [Ariz.Rev.Stat.] § 29–731. An assignee that has not become a member is only entitled to receive, to the extent assigned, the share of distributions, including distributions representing the return of contributions, and the allocation of profits and losses, to which the assignor would otherwise be entitled with respect to the assigned interest. (emphasis added)

**12.** Ariz.Rev.Stat. § 29–655(A) provides in relevant part:

A. On application to a court of competent jurisdiction by any judgment creditor of a member, the court may charge the member's interest in the limited liability company with payment of the unsatisfied amount of the judgment plus interest. To the extent so charged, the judgment creditor has *only the rights of an assignee* of the member's interest. (emphasis added)

**13.** The *Albright* court observed that in a multi-member LLC the result would be different. "Where a single member files bankruptcy while the other members of a multi-member LLC do not, ... the bankruptcy estate is only entitled to receive the share of profits or other compensation by way of income and the return of the contributions to which that member would otherwise be entitled." 291 B.R. at 540 n. 7. Our decision in this appeal, however, does not involve a multi-member LLC.

from being forced to involuntarily share governance responsibilities with someone they did not choose, or from being forced to accept a creditor of another member as a co-manager. *Id.* at 541. "A charging order protects the autonomy of the original members, and their ability to manage their own enterprise." *Id.; see also, Olmstead v. Fed. Trade Comm'n,* 44 So.3d 76, 81 (Fla.2010) (noting that the charging order provision under Florida's LLC Act "simply acknowledges that a judgment creditor cannot defeat the rights of non-debtor members of an LLC to withhold consent to the transfer of management rights.")

We agree with the outcome in *Albright,* but reach the same conclusion by way of another path.

### a. Section 541(c)

■ We conclude that all of Debtors' contractual rights and interest in Redux became property of their estate under § 541(a)(1) by operation of law when they filed their petition. Section 541(c)(1)(A) overrides both contract and state law restrictions on the transfers or assignment of Debtors' interest in Redux in order to sweep all their interests into their estate. § 541(c)(1)(A).[14] Accordingly, the restrictions Debtors point to under the operating agreement or the Arizona LLC Act did not prevent the vesting of their contractual rights in their bankruptcy estate. *See Movitz v. Fiesta Invs., LLC (In re Ehmann),* 319 B.R. 200, 206 (Bankr.D.Ariz. 2005) (noting limitations in operating agreement of multi-member LLC and provisions under Arizona's LLC Act fell within scope of § 541(c)(1)). As a result, the trustee was not a mere assignee, but stepped into Debtors' shoes, succeeding to

all of their rights, including the right to control Redux. *Id.* For this same reason, we are not persuaded by Debtors' argument that relegates the trustee to the role of a judgment creditor and the remedy of a charging order under Ariz.Rev.Stat. § 29–655(A).

### b. Section 365

Generally, the bankruptcy estate automatically succeeds to a debtor's assets. However, because an executory contract is both a potential asset and a potential liability of the debtor it is treated differently.

The trustee's power to reject those executory contracts which he finds burdensome to the bankrupt's estate is an extension of his power to renounce title to and abandon burdensome property which is already a part of the estate. Because executory contracts ... involve future liabilities as well as rights, however, an affirmative act of assumption by the trustee is required to bring the property into the estate in order to ensure that the estate is not charged with the liabilities except upon due deliberation. Thus, executory contracts ...— unlike all other assets—do not vest in the trustee as of the date of the filing of the bankruptcy petition. They vest only upon the trustee's timely and affirmative act of assumption.

*Cheadle v. Appleatchee Riders Ass'n (In re Lovitt),* 757 F.2d 1035, 1041 (9th Cir.1985) (citations omitted). Thus, if the operating agreement is an executory contract as Debtors contend, § 365 governs the trustee's rights rather than § 541(c)(1). In that event, the restrictive provisions under the Arizona LLC Act or the operating agreement that affect the transfer of Debt-

---

**14.** Section 541(c)(1)(A) provides in relevant part:

[A]n interest of the debtor in property becomes property of the estate under subsection (a)(1) ... notwithstanding any provi-

sion in an agreement, transfer instrument, or applicable nonbankruptcy law—(A) that restricts or conditions transfer of such interest by the debtor....

ors' rights and interests in Redux may be enforced through operation of § 365 in some instances.[15]

Whether a contract is executory within the meaning of the Bankruptcy Code is a question of federal law. *Benevides v. Alexander (In re Alexander)*, 670 F.2d 885, 888 (9th Cir.1982). A contract is executory only when the "obligations of both parties are so far unperformed that the failure of either party to complete performance would constitute a material breach and thus excuse the performance of the other." *Ehmann*, 319 B.R. at 204 (quoting *Unsecured Creditors' Comm. v. Southmark Corp. (In re Robert L. Helms Constr. & Dev. Co.)*, 139 F.3d 702, 705 (9th Cir.1998)). Obviously, the definition of an executory contract presumes that there are other parties to the contract besides Debtors.

Debtors ignore the fact that they are the sole members and 100% owners of Redux and thus there are essentially no "other parties" to the operating agreement. Therefore, application of an executory contract analysis in this context does not make sense. Debtors could decide to have Redux withhold profits and distributions and otherwise control the underlying assets, thereby hamstringing the chapter 7 trustee into a perpetual stalemate at the expense of their creditors. Executory contract law does not work to produce such an absurd result.

Moreover, Debtors seek to use the asserted executory nature of the operating agreement to ensnare the trustee rather than for the purpose for which it was intended—namely, to have a reference for determining whether the assumption of a contract would impose administrative liability on the estate. *Ehmann*, 319 B.R. at 205 n. 4 (citing *In re Bergt*, 241 B.R. 17, 21–36 (Bankr.D.Alaska 1999)). However, Debtors' efforts fall short because they mistakenly argue that the operating agreement, as an executory contract, "rides through" their bankruptcy. The ride through doctrine does not apply in a chapter 7 case. *Diamond Z Trailer, Inc. v. JZ L.L.C. (In re JZ L.L.C.)*, 371 B.R. 412, 422–23 (9th Cir. BAP 2007).

Section 365(d)(1) plainly states that if the chapter 7 trustee does not assume or reject an executory contract within 60–days, "then such contract ... is deemed rejected." § 365(d)(1). The result of the "deemed rejected" language is that Debtors are relieved of burdensome future obligations under the operating agreement while they are trying to recover financial-

---

15. Section 365 provides in relevant part:

(c) The trustee may not assume or assign any executory contract or unexpired lease of the debtor, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties, if—
(1)(A) applicable law excuses a party, other than the debtor, to such contract or lease from accepting performance from or rendering performance to an entity other than the debtor or the debtor in possession, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties;
 . . . .
(d)(1) In a case under chapter 7 of this title, if the trustee does not assume or reject an executory contract ... within 60 days after the order for relief ... then such contract ... is deemed rejected.
 . . . .
(e)(2) Paragraph (1) of this subsection does not apply to an executory contract or unexpired lease of the debtor, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties, if—
(A)(i) applicable law excuses a party, other than the debtor, to such contract or lease from accepting performance from or rendering performance to the trustee or to an assignee of such contract or lease, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties; and (ii) such party does not consent to such assumption or assignment. . . .

ly. Rejection also constitutes a breach of a contract which permits the other party to file a creditor's claim. But, Debtors clearly do not want to be relieved of their "burdensome" future obligations and, as previously noted, there are no other parties to file a creditor's claim. As the foregoing discussion amply demonstrates, analyzing the operating agreement as an executory contract does not serve any of the purposes of § 365.

■■■ Even if we could accept the executory nature of the operating agreement, application of § 365(c)(1) and (e)(2)(A) would be meaningless in this context. These sections were designed "to protect non-debtor third parties whose rights may be prejudiced by having a contract performed by an entity other than the one with which they originally contracted...." *C.O.P Coal Dev. Co. v. C.W. Mining Co. (In re C.W. Mining Co.),* 422 B.R. 746, 761 (10th Cir. BAP 2010). There are no non-debtor third parties to protect here. *See In re Modanlo,* 412 B.R. 715, 727 (Bankr. D.Md.2006) ("By definition, there can be no remaining members of a single member LLC ... whose personal relationships (among members) could be compromised by being forced to accept substitute performance from a stranger (bankruptcy trustee)."). Finally, the plain language of § 365(c)(1) and (e)(2)(A) makes clear that the provisions are not for the debtor's protection.

Accordingly, for all these reasons, we decide that § 365 has no application in this case. *Id.* at 727 n. 16 (*citing* 9 Susan Kalinka, *Limited Liability Companies and Partnerships: a Guide to Business and Tax Planning,* Louisiana Civil Law Treatise § 1.44 (2006) (concerning multi-member LLC's but pointing out that there "is no reason to prohibit a trustee in bankruptcy from assuming all of the rights and obligations of a debtor who is the only member of a single-member LLC. In that

case, there are no non-debtor members whose interests could be harmed by the operation of the LLC by a trustee or debtor in possession.")).

In sum, the bankruptcy court correctly found, as a matter of law, that Debtors' membership interests and contractual rights under the operating agreement became property of their estate.

### 3. After the Commencement of the Case

■■■ We have no difficulty deciding that Debtors' transfer to Thompson occurred after the commencement of their chapter 11 case. The conversion of Debtors' chapter 11 case to one under chapter 7 constitutes an order for relief under chapter 7, but does not "effect a change in the date of the filing of the petition, the commencement of the case, or the order for relief." § 348(a). Thus, as the bankruptcy court properly concluded in denying Debtors' Motion for Reconsideration, the conversion of their case had no effect on the trustee's avoidance rights. Rather, the trustee was vested with avoidance rights under § 549 from the commencement of Debtors' case.

### 4. Authorized By Statute

■■■ Debtors contend, without much discussion or analysis, that as debtors-in-possession they were entitled to make transfers like the one to Thompson as part of the ordinary course of conducting their business. With certain limitations, § 1107 gives a debtor-in-possession all the rights, functions and duties possessed by a trustee. Section 1108 allows the trustee to operate the debtor's business. When the debtor's business is being operated under §§ 1107 and 1108, § 363(c)(1) gives the debtor-in-possession authority to enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and to use property of the

estate in the ordinary course of business without notice or a hearing.

 The vertical dimension, or creditor's expectation, test and the horizontal dimension test are applied to determine whether a transaction is within the ordinary course of business for purposes of § 363(c). *Straightline Invs.*, 525 F.3d at 879. Debtors must satisfy both tests to prove the ordinary course of business defense. *Id.*

Yet, Debtors neither discuss these tests nor argue that they are met in this appeal.[16] Debtors simply assert that adding a member such as Thompson to contribute funding to complete the real estate project of Redux was in the normal course of business and "not extraordinary," but this is argument and not proof. The record shows that Debtors submitted no evidence that they ever admitted a member aside from the one instance of admitting Thompson. Moreover, Debtors had a 100% interest in Redux from its inception in mid–2007 until they made the transfer to Thompson in early 2009—just six months after they filed for bankruptcy. There is no proof that Debtors' transfer to Thompson was precipitated by anything other than their bankruptcy filing. Finally, common sense dictates that this transaction was not the type which similar businesses would make in the ordinary course. *Compare Credit Alliance Corp. v. Idaho Asphalt Supply, Inc. (In re Blumer)*, 95 B.R. 143, 148 (9th Cir. BAP 1988). Based on the record provided, we conclude that neither test for the ordinary course of business defense was met as a matter of law.

Accordingly, there is no genuine issue of any material fact with respect to this defense.

**5. Good Faith Purchaser Defense Under § 549(c)**

 Finally, § 549(c) provides an exception to avoidance when a transfer of an interest in real property to a good faith purchaser is made. Debtors' 100% membership interest constitutes personal property. Since Congress chose to protect only good faith transferees of real property under § 549(c) and failed to mention good faith transferees of personal property, it must have intended that postpetition transfers of personal property be avoidable regardless of the knowledge or good faith of the transferee. *Hayhoe v. Cole (In re Cole)*, 226 B.R. 647, 653–54 (9th Cir.BAP1998) (citing *Hohn v. United States*, 524 U.S. 236, 250, 118 S.Ct. 1969, 141 L.Ed.2d 242 (1998)) ("Where Congress has failed to include language in statutes, it is presumed to be intentional when it has used such language elsewhere in the Code."). Accordingly, the exception to avoidance for good faith transferees is inapplicable under these circumstances. *Kupetz v. United States (In re Williams)*, 104 B.R. 296, 299 (Bankr.C.D.Cal.1989).

## VI. CONCLUSION

For the reasons stated above, we AFFIRM.

---

**16.** To determine whether the transaction meets the vertical dimension test, courts often compare the debtor's pre-petition business activities with that of debtor's post-petition business activities. *Straightline Invs.*, 525 F.3d at 879. If the debtor's post-petition transaction is ordinary relative to the pre-petition relationship between the debtor and the creditor, a court will find that the post-petition transfer did not expose creditors to unknown risks, thereby satisfying the test. *Id.* at 880. The horizontal dimension test requires a finding that the transfer was of a type which similar businesses would make in the ordinary course of business. *Id.* at 881. The purpose of this test is to "assure that neither the debtor nor the creditor [did] anything abnormal to gain an advantage over other creditors." *Id.*