In re Jeffrey A. GARBINSKI and
Lynn A. Garbinski, Debtors.

Natalie Lutz Cardiello,
Trustee, Movant

v.

United States of America, Internal
Revenue Service, et al.,
Respondents.

No. 11–21160–TPA.

United States Bankruptcy Court,
W.D. Pennsylvania.

Feb. 16, 2012.

Robert O. Lampl, Pittsburgh, PA, for Debtors.

## MEMORANDUM ORDER

Related to Doc. No. 358

THOMAS P. AGRESTI, Chief Judge.

The Trustee has filed a *Motion to Sell Property of the Estate Free and Clear of All Liens, Claims and Encumbrances in Accordance with 11 U.S.C. § 363(b) and (f)* ("Sale Motion") at Document No. 358. This date, the Court convened a Status Conference on the *Sale Motion* to announce that it was prepared to deny the *Sale Motion* at this preliminary stage since it was unable to make the required finding of good faith unless the Parties could convince it otherwise. The Parties were unable to do so. As a result, the *Sale Motion* will be denied without prejudice.

Through the *Sale Motion* the Trustee is proposing to sell the following interests, all related to the "Highland Country Club," which were owned by the Debtor Husband, Jeffrey Garbinski, at the time of the filing of his bankruptcy petition:

- 49.5% ownership interest in "J & J Holdings," a Limited Partnership

- 50% ownership interest in "General Partner," a Limited Liability Company

- 50% ownership interest in "J & J Operations," a Limited Liability Company

The Trustee is proposing to sell these interests to Jeffrey Cuny ("Cuny") for a total of $150,000, consisting of $149,000 for the J & J Holdings interest, and $500 for each of the other two interests. Cuny is currently the owner of another 49.5% interest in J & J Holdings, and the remaining 50% interests in General Partner and J & J Operations.[1] General Partner owns the remaining 1% interest in J & J Holdings and is the general partner for that entity. The *Sale Motion* contemplates that others may pre-qualify as bidders for these interests, and if anyone does so a public auction will be held on the date of the hearing on the *Sale Motion*, otherwise the sale will be made to Cuny.

While the Court has approved bidding procedures for the proposed sale so the process could continue to move forward, it has all along made no secret of the fact that it questions whether the sale can ultimately be approved under the standard of good faith as required by the decision in *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143 (3rd Cir.1986). Continued reflection on the matter has only reinforced the Court's concerns. There are a number of reasons for the concern, but the central one is that the almost inevitable result will be a sale to Cuny, an insider who is alleged to have been unilaterally operating the entities for almost 1 ½ years. The Court reaches this conclusion based

---

1. At the Status Conference, Counsel for the Trustee stated that, just prior to start of the conference, he had been informed that Cuny planned to sell his existing interests to an entity known as "Limerick Land Partners." On the surface and without more, this appears to be a transparent effort to change Cuny's status as an insider of the J & J entities and General Partner. The Court was not provided with any proof that the anticipated sale to Limerick Land Partners would be an arms-length transaction and in any event, it comes far too late to salvage the sale as proposed in the *Sale Motion*.

on, among other things, the following statement in the *Sale Motion:*

> It is Purchaser's [*i.e.,* Cuny's] position that in order for a holder of the Business Interests to become either a member or partner, the party must first obtain the consent of the remaining partners in J & J Holdings and members of General Partner and J & J Operations.

*Sale Motion* at ¶ 24.

In other words, since Cuny himself is the "remaining partner . . . and member" in question, he is claiming the effective right to veto the ability of any other prospective purchaser to become a partner or member in the entities, with all the management and other rights that such status entails. Other prospective purchasers are thus left with only the assurance of obtaining a completely passive economic interest in the entities in exchange for their payment; any partnership/management rights will depend on the sufferance of Cuny, or the willingness of the purchaser to litigate the matter and hope for success. The Court has a hard time believing there will be any other purchasers willing to bid under these conditions, making the prospect of any auction sale illusory, and the sale to Cuny a foregone conclusion. Whether or not intended as a means of shutting out other potential buyers, that clearly appears to be the inevitable result.

The Court recognizes that the Trustee is in somewhat of a difficult position and commends her efforts to generate some funds for the estate and some recovery for unsecured creditors by way of the sale.

However, the Court must take a broader view, and in that regard a sale with only one realistic possibility for a buyer, and at that an insider, raises a red flag. But even under these conditions a sale might be approved in certain circumstances. For example, if the Court were assured that $150,000 is a fair price for the interests being sold, or if the Trustee had no other options available to her, the Court might nevertheless be persuaded that the sale was in good faith. Neither of these is the case, however.

First, as to the fairness of the price, the Court has been provided with nothing to support $150,000 as a reasonable amount for the interests in question. No appraisal has formally been submitted in connection with the *Sale Motion,* and it is not disclosed how the Trustee came to the conclusion that $150,000 is a fair price. The only "evidence" the Court has seen going to the value of the interests is a representation in a motion for relief from stay filed by Slovak Savings Bank ("SSB"), which holds a mortgage on the real property owned by J & J Holdings, that it is in possession of a "May 5, 2011 appraisal" showing a fair market value of the real estate as $2,215,000.[2] Counsel for the Trustee also made reference to this appraisal at the Status Conference. Assuming the appraisal provides an accurate value for the property, it would indicate that there is some equity, though fairly small such that $150,000 might be a fair price for the interests proposed to be sold.

The Court, however, has never been provided with a copy of this appraisal and thus has no idea whether it should be

---

**2.** SSB has actually filed the motion twice. *See* Doc. Nos. 48, 307. The first motion was continued on consent and eventually withdrawn. The second motion was accompanied by a waiver of the 30–day requirement for hearing and on consent, was continued to the date of the hearing on the *Sale Motion.* At

the Status Conference, Counsel for SSB made clear that it feels relatively secure in its position and is not insistent that a sale of real estate be effected through a foreclosure. SSB has agreed to stay the sale pending further order of this Court.

deemed reliable. Furthermore, it now seems clear that the likely eventual use of the property represented by the interests to be sold, and not that far off in time since development restrictions on the property expire at the end of 2012, is as a residential development rather than a golf course. That could obviously have a significant effect on value, but the Court was informed at the Status Conference that the May 2011 appraisal prepared for SSB only values the property as a golf course.

There are a number of reasons to believe that the value of the property as a residential development may be much greater than the appraised value. The property consists of 120 acres in a prime residential area to the north of the City of Pittsburgh. At one earlier hearing in the case, then-counsel for the Debtor stated a belief that the property could be "worth $6 million." To be candid, that seemed high to the Court at the time but that was before it was aware of the potential for development. A further indication that the property's value may exceed the appraised value became apparent during the Status Conference when Counsel for SSB stated that it has been contacted by "multiple parties" expressing an interest in acquiring the property.

Further compounding the concern as to the fairness of the price is the fact that the would-be buyer, Cuny, has been in effective sole control of the entities for an extended period of time, predating the bankruptcy filing. The Court has been given no assurance that the Trustee has been given access to the books and records of the entities to help her determine that the price being offered is fair.

■ Second, as to the Trustee's alternatives to this sale, the Court believes those alternatives may not be limited to the extent that she has no real option but to sell to Cuny. The unusual feature of this case is that there is no operating agreement for any of the entities. (At least that is what both the Trustee and Cuny contend). In other cases involving the sale of partnership or LLC interests, the courts have had to deal with *11 U.S.C. § 365* and have had to make a determination whether an operating agreement for the entity qualifies as an "executory contract" under that provision. The results in the cases have been mixed, but broadly speaking, if an operating agreement is found to be an executory contract, *Section 365(c)* permits a non-debtor party to enforce specific transfer restrictions contained in it against the trustee. For instance, the agreement might contain provisions that would prevent the trustee from transferring an interest in the entity.

*Section 365* is thus in apparent conflict, or at least in tension, with *11 U.S.C. § 541(c)(1)*, which provides that an interest of the debtor in property becomes *property of the estate notwithstanding* any provision in an agreement or applicable non-bankruptcy law that restricts or conditions transfer of such interest by the debtor, or that is conditioned on the insolvency or bankruptcy of the debtor and that effects or gives an option to effect a forfeiture, modification, or termination of the debtor's interest in property. Cases involving debtors who are partners or members of entities with operating agreements thus have to work through the often thorny process of reconciling these two provisions of the Code. However, since there are no operating agreements in this case, Section 365 can be disregarded and the Court can look solely to *Section 541(c)(1)*.

■ The cases are pretty clear that *Section 541(c)(1)* acts to override any provision of state law that would otherwise limit or restrict a trustee with respect to a debtor's limited liability or limited partnership interests. In other words, any at-

tempt to invoke state law to treat a trustee as a mere "assignee," who does not enjoy any management rights in the LLC or partnership entities, fails as a result of *Section 541(c)(1)*. For instance, the court in *In re First Protection, Inc.*, 440 B.R. 821, 830 (9th Cir. BAP 2010) stated that *Section 541(c)(1)*:

> overrides both contract and state law restrictions on the transfers or assignment of Debtors' interest in [the LLC] in order to sweep their interests into their estate.... As a result, the trustee was not a mere assignee, but stepped into Debtors' shoes, succeeding to all of their rights, including the right to control [the LLC.].

*See also, In re Prebul*, 2011 WL 2947045 (Bankr.E.D.Tenn.2011); *In re Dixie Management & Inv. Ltd. Partners*, 2011 WL 1753971 (Bankr.W.D.Ark.2011) (bankruptcy trustee had right to continue as member of limited partnership); *Matter of Daugherty Constr., Inc.*, 188 B.R. 607 (Bankr.D.Neb.1995).

■ The significance of this for the present case, is that *Section 541(c)(1)* thus effectively places the Trustee in the shoes of the Debtor, thereby allowing her to exercise rights as a partner/member seeking to obtain a judicial dissolution and winding up of the entities by invoking state law remedies involving dissolution or liquidation of LLC or limited partnership entities. *See, e.g. In re Smith*, 185 B.R. 285 (Bankr.S.D.Ill.1995) (debtor's right as limited partner to seek judicial dissolution of partnership was estate property, and trustee as representative of the estate succeeded to that right). The *Smith* court even went on to find that it had jurisdiction to hear a dissolution action brought by the trustee. See also, *In re Ehmann*, 319 B.R. 200 (Bankr.D.Ariz.2005) (trustee had all rights and powers with respect to the company that the debtor held as of the

commencement of the case, including the right to seek dissolution); *In re Baldwin*, 2006 WL 2034217 (10th Cir. BAP 2006) (same).

The Court has previously identified state law provisions that would seem to give the Trustee the ability to seek judicially supervised dissolution and winding up of the entities in question. *See 15 Pa.C.S.A. §§ 8572, 8573* (limited partnerships) and *8972, 8973* (LLCs). If this option were exercised by the Trustee, and if relief were granted, the entities could be sold intact, with the proceeds divided between the estate and Cuny. This would open up the sale process to a whole universe of potential purchasers rather than effectively restrict the bidding solely to Cuny.

At the Status Conference, Counsel for the Trustee informed the Court that he and the Trustee had taken the prior concerns expressed by the Court to heart and considered the possibility of seeking a judicial dissolution of the J & J entities and General Partner but rejected that approach for a number of reasons. The Court acknowledged that it is up to the Trustee to determine the appropriate strategy in approaching the sale of the Debtor's assets and respects her right to proceed as she sees fit. The Court reiterates that view here. If, after having had the opportunity to digest the Court's observations as expressed herein and at the Status Conference, the Trustee continues to believe a sale of the Debtor's interests is the best approach, the Court will accept that and review any new proposed sale on its own merit with no preconceptions.

There is one last area of concern about the proposed sale that deserves to be mentioned as well, although in isolation, it may not have been sufficient to require a denial of the *Sale Motion*. The Court is referring to the proposed distribution of sale proceeds. The lion's share of the proceeds, up to almost $90,000, is to go to the

law firm that prior to today's Status Conference represented Cuny in this matter.[3] This represents payment on a lien which that firm previously secured on the interests to be sold, presumably based on prior legal work done for the J & J and General Partner entities. Additionally, the benefit to unsecured creditors is set and capped at $15,000 of the sale proceeds and the unsecured creditors will not "share" in any increase of the sales price (no matter how theoretical that possibility may be) yet the law firm apparently will benefit. This is also troubling to the Court. The proposed distribution schedule, coupled with the insider nature of the sale (despite recent steps taken to eliminate the notion), cannot be ignored in weighing the required good faith finding necessary to support the sale.

■ To sum up, given the insider status of the proposed sale, the lack of any evidence to show the fairness of the proposed price, the other options available to the Trustee apart from an insider sale, and the proposed distribution of sale proceeds, the Court would be unable to conclude the sale meets the applicable good faith standard. It is thus futile to go any further in the process, wasting the time and expenses of the Parties and the Court. For all the reasons stated above,

*AND NOW,* this *16th* day of *February, 2012,* it is hereby *ORDERED, ADJUDGED and DECREED* that the *Motion to Sell Property of the Estate Free and Clear of All Liens, Claims and Encumbrances in Accordance with 11 U.S.C. § 363(b) and (f)* filed at Document No. 358 is *DENIED,* without prejudice.

**3.** At the Status Conference the Court was informed that Cuny has secured new counsel for the *Sale Motion.* This step goes toward alleviating concerns that the Court had previously expressed about counsel's representation of Cuny which representation under the circumstances could give rise to an appearance of impropriety.